[Civ. No. 520.        Third Appellate District.—January 27, 1909.]

## PAUL ANTONIAN, Respondent, *v.* SOUTHERN PACIFIC COMPANY, Appellant.

NEGLIGENCE—COLLISION OF MOVING CAR WITH BICYCLE RIDER—ABSENCE OF WARNING—CAUTION OF PLAINTIFF—CONTRIBUTORY NEGLIGENCE—QUESTION OF FACT.—In an action for damages arising from the alleged negligence of the defendant in causing a backing car to collide with plaintiff's bicycle, to his injury, without warning, while he was crossing the track thereon, when it appears that the jury were justified in finding from the evidence that there was no light on the moving car, and that no warning was given of its approach in any manner until plaintiff was in such close proximity to it that when he saw it backing he could not with ordinary care avoid injury, and it also appears that before plaintiff attempted to cross the track he looked and listened and saw and heard no car approaching, though he did not stop while doing so, the question of his contributory negligence was one of fact for the jury. ·

ID.—DEGREE OF CARE REQUIRED OF PERSON CROSSING TRACK—ORDINARY CARE TO AVOID INJURY.—The law requires no more of a person approaching a railroad crossing upon a public highway than that he use ordinary care to avoid injury, which is such care ·as a reasonable and prudent man would use under the same or similar circumstances. Ordinary care requires that he should look and listen attentively both ways, and look and listen from a point where he can do so effectively; though it cannot be affirmed, as matter of law, what is the precise number of feet from the crossing at which the traveler must look and listen, the underlying test being, Did the traveler exercise ordinary care in selecting the place?

ID.—TRAVELER NOT REQUIRED TO STOP AS MATTER OF LAW—QUESTION FOR JURY.—Though circumstances may appear from which the duty may be cast upon a traveler, as a man of ordinary prudence, in the exercise of ordinary care, to stop before attempting to cross a track, yet there is no such rule of law applicable to all circumstances; and it is for the jury to say from the facts of the particular case whether the traveler should have stopped, either before he commenced to cross the tracks, or before he crossed the particular track upon which the accident occurred, by reason of cars backing thereon, without warning or guard, the presence of which he did not anticipate, before actual discovery.

ID.—UNERRING JUDGMENT NOT REQUIRED IN STRESS OF PERIL—NEGLIGENCE OF DEFENDANT.—The plaintiff who had taken ordinary precautions against danger, before attempting to cross the tracks, and saw and heard no moving cars, was not required to exercise unerring judgment when he first discovered the collision threatening

him from cars backing, without warning or guard, and he is excusable if he made an unwise choice, under the disturbing influence upon his mind caused by defendant's negligence; and it is sufficient that he used the only means which seemed to him available to avoid injury.

ID.—REASONABLENESS OF EFFORT TO ESCAPE INJURY—QUESTION FOR JURY.—The plaintiff, in the presence of the impending danger, was only required to do what seemed reasonable under the circumstances known to him; and the reasonableness of his effort to avoid the injury, after discovery of the danger, was a question for the jury, to be determined by them, in view of all the circumstances of the particular case.

ID.—PRESUMPTION OF ABSENCE OF NEGLIGENCE NOT ALLOWED—CONTRIBUTORY NEGLIGENCE—CIRCUMSTANCES TO BE CONSIDERED BY JURY. While it is true that the plaintiff in crossing the railroad track may not rely upon the assumption that the railroad company will not be guilty of negligence, and that its negligence will not absolve him from the duty to exercise the usual and ordinary precautions required of a person about to cross a railroad track, yet all the circumstances may be considered by the jury, including those pointing to the defendant's negligence—not as excusing contributory negligence on plaintiff's part, but as tending to explain his conduct, of which the jury are to determine whether or not it, in fact, constitutes contributory negligence.

ID.—GENERAL AND SPECIAL VERDICT—PRESUMPTION IN FAVOR OF GENERAL VERDICT, UNLESS SPECIAL VERDICT IS ABSOLUTELY IRRECONCILABLE.—All presumptions are in favor of the general verdict for the plaintiff, which determines all issues in his favor, including the question of contributory negligence, where there is evidence to support it; and it must control, if the special verdict is not absolutely irreconcilable therewith.

ID.—SPECIAL FINDINGS NOT IRRECONCILABLE WITH GENERAL VERDICT—HYPOTHETICAL ISSUES IGNORING CIRCUMSTANCES.—When, in addition to a special finding that no warning was given by anyone to plaintiff, before he crossed the track, hypothetical issues were submitted which ignored the existing circumstances in proof, and asked whether the accident could have been prevented, if plaintiff had stopped when he first reached a point where he could have seen the approaching cars, to which the answer was "Yes," and as to how near the plaintiff was to the track where the accident occurred when he could have seen them, to which the reply was "about seven feet"; *held,* that such special findings are not irreconcilable with the general verdict, which must control, under the law applicable to the existing circumstances in proof.

ID.—INSTRUCTIONS NOT INCONSISTENT WITH GENERAL VERDICT.—*Held,* that in considering whether the instructions were inconsistent with

the general verdict, they must be construed together as a whole, and that, so taken, they were not inconsistent with the general verdict; and that mere hypothetical instructions, that if the jury believe from the evidence that plaintiff could have stopped instantly when the train was in view of him, or when he could have seen it, he was guilty of contributory negligence in not doing so, are not inconsistent with the general verdict, which found from the evidence that defendant was not in view of the backing car until his front wheel was upon the track, and that until then he had no reason to anticipate its presence, and that then to have stopped instantly would have meant certain injury, if not death; and that there was no contributory negligence of plaintiff, as matter of fact.

APPEAL from a judgment of the Superior Court of Fresno County, and from orders denying a motion for a new trial, and from an order refusing to direct the clerk, after judgment, to enter judgment for defendant-appellant, upon the special issues and findings of the jury. H. Z. Austin, Judge.

The facts are stated in the opinion of the court.

L. L. Cory, for Appellant.

Sutherland & Barbour, for Respondent.

CHIPMAN, P. J.—This is an action to recover damages for an injury to the person of plaintiff alleged to have resulted from defendant's negligence. The cause was tried by a jury and a general verdict found in favor of plaintiff. Certain special issues were submitted to the jury and answered as follows:

"1. Could the accident to the plaintiff have been prevented if the plaintiff had stopped instantly when he first reached a point at the crossing where he could have seen the approaching cars? A. Yes.

"2. Was a warning given by anyone to the plaintiff before he crossed the track? A. No.

"3. If he had stopped instantly when the warning was given, could the plaintiff have prevented the accident? A. ———.

"4. How near was the plaintiff to the track upon which the accident occurred when he was first in a place where he could have seen the approaching cars? A. About seven feet.

"5. Did the plaintiff approach the track upon which the accident occurred in such a manner that he could have stopped instantly?   A. No."

Judgment passed for plaintiff on the verdict, from which and from the order denying its motion for a new trial defendant appeals, and also from an order denying defendant's motion, made after judgment, directing the clerk to set aside the judgment entered upon the general verdict and to enter judgment in favor of defendant upon the special issues and findings of the jury.

Plaintiff resided in that portion of the city of Fresno situated west of the defendant's railroad tracks. About half-past 10 o'clock on the night of August 17, 1905, he was returning to his home riding a bicycle, from the principal part of the city, situated on the east side of defendant's tracks; he was traveling along the north side of Tulare street where it crosses the tracks and along what was spoken of and used as a bicycle path, about where the sidewalk would have been located had it been extended across the tracks, on the north side of that street; at this crossing there are eight tracks, running north and south; going west from the east side, the first is a short track designated sometimes as the "Sanger Line"; the second track is the main line from San Francisco to points south; the third, fourth and others are used for switching purposes.   The accident occurred on track 4.

Plaintiff testified: "I was riding on the bicycle path.   As I turned into Tulare street going to the railroad crossing, I noticed the electric light above the crossing was out, and it was very dark.   I was riding about as fast as a man usually walks.   When I came to the railroad crossing I looked in both directions and listened but I couldn't see or hear anything.   My wheel was not making noise."   On the third track and north of the crossing, two or three feet from the path, a box-car was standing near the street.   "Just as I crossed the track where the box-car was standing, I heard some one hallo in the darkness.   It frightened me so much before I knew anything more I saw a flat car was coming toward me, just the next track where the box-car was standing, and it was only about eight feet from me, may be it was less than eight feet.   When I first saw this flat car, my front

9 Cal. App.—46

wheel was across this first track, across the first rail of the
first track west of where the box-car was standing, that is the
track where the accident happened. When I saw the flat
car was coming toward me, I just pressed my pedal hard, to
get across there, to save myself from being killed, and the
flat car struck my back wheel and threw me on the ground
with my legs on the track. As quickly as I could I pulled
my both legs out of the way, but before I did it it caught
my right foot and crushed it. . . . I had been riding a bicycle
for about four years. That night I came toward the cross-
ing on my wheel, there was no flagman at the crossing, and
no light at all; it was very dark too as I got by that box-car
and when I first saw the flat car I didn't see any light. I
did not hear the sound of those flat cars and did not hear
any bell ringing nor any whistle blow. I am a house painter
by trade." On cross-examination he testified: "My eyesight
is good and so is my hearing; . . . I was listening and didn't
hear anything and didn't see anything. . . . When I was
crossing I was looking and watching out for anything I could
see, and I was within eight or nine feet of the box-car be-
fore I saw it, it was so very dark. I did not see any switch-
men, or light at the crossing at all, and nobody else. When
I passed this box-car, then I could see up or down the track,
there was nothing to prevent it; just as I passed this track 3
I could look up and down track 4, but some one hallooed in
the darkness just as I crossed by the box-car. At the same
time I saw the flat car coming behind me from the next
track. Just as I got past that box-car somebody yelled,
hallooed. Then at the same time when my front wheel was
across the first rail I saw the flat car coming. When I just
crossed this track, the box-car, when some one hallooed in the
darkness, I was so frightened, and my front wheel was across
the rail when I saw the flat car was coming there. When I
passed the box-car on track 3 I looked up and down the track
and saw nothing. I couldn't see the cars coming at all. I
heard some one hallo, that is all. My head was not down;
I could see plainly. I couldn't see the person that halloed,
I couldn't see where the voice came from; I didn't see any-
body at all. As I said, I was on the first rail when I saw
the flat car. When the men halloed in the darkness the front
wheel of my bicycle was on the rail of track 4, and at that
second I saw the flat car coming toward me. I did not stop

but worked my pedal hard, tried to get across. I did not turn my wheel to the right or left, but went straight ahead. . . . I am very familiar with this crossing, having crossed it many times, both at night and day.''

Witness Holderman and witness York were crossing the tracks on bicycles on the south side of Tulare street at this same moment. They both testified to the darkness of the night; that they looked and listened but saw no one at the crossing with or without a lantern, and saw no cars and heard no cars approaching Tulare street until about the instant plaintiff was struck, and heard no whistle or bell; that they heard some one a short distance south of the street call out about the instant that plaintiff had passed the box-car. York testified: ''I looked up and down and did not see any cars moving and I did not hear any cars. There was no light on any moving cars and I did not hear any bell or whistle. I heard this man south of Tulare street yell 'look out,' then I looked where the yell came from, it was so dark I could hardly see whether there was a man there or not. . . . After the yell Antonian was struck in about a second, probably not that long, because it was as soon almost as I could turn my head the two ways. . . . There was no light on the end of these cars. Those cars were not making any noise that I could hear. The first thing I heard was the crushing and grinding when they came together.''

It appeared that the servants of defendant were engaged in switching a train of about twenty cars so as to distribute them to different tracks, crossing Tulare street, back and forth, in the operation; a number of cars had thus been shunted out of the train and with the remaining ten or twelve cars it had moved north of the street and stopped with the rear flat car a short distance from the street, the engine at the other end of the train, as testified by Hamilton, one of the switchmen. This witness, Hamilton, does not make clear where he stood when the train backed onto Tulare street. The testimony of the witness above noted was that no one was at the crossing with a lantern or at all. If Hamilton had been there at some time, which is probable, the jury must have found that he had left the crossing before these wheelmen came near enough to see him, for they did not see or hear him. Hamilton's testimony was that plaintiff was moving twice as fast as the train, and both had

the same distance to travel to reach the bicycle path, crossing track 4. Accordingly, plaintiff would easily have cleared the cars with distance to spare. However, there was testimony and the jury were justified in finding that no one was at the crossing with or without a lantern when plaintiff came near to it, and Hamilton testified that there was no light and no person on the rear flat car. It was testified, by the trainmen, that besides the box-car standing on track 3 near the bicycle path, ''there were box-cars attached to it, it was on the rear of a string of cars,'' as testified by Tracy; and as testified by Hamilton, ''there were possibly seven or eight cars standing on track 3.'' It should also be stated that the distance between the west rail of track 3 and the east rail of track 4 was eight feet and two and three-eighths inches, and from the projection of the woodwork of the box-car on track 3 was not more than seven feet, as may be inferred from the finding of the jury. Traveling at the rate of three miles an hour, plaintiff was moving at the rate of four and six-tenths feet per second, so that in about one and one-half seconds of time he would pass from the box-car to the east rail of the track where he testified that he first saw the cars coming toward him and but a few feet from him—''8 feet or less,'' as he testified.

As to the degree of darkness that night, we have the statements of witnesses against which an almanac was introduced by defendant which showed that the moon rose at 8:25 P. M. But it did not appear whether the night was cloudless and free from fog, nor how far above the horizon the moon would be at 10:30 P. M. We may assume, I think, at its then position in the sky, that its slanting rays of light would tend rather to intensify the darkness immediately west of the box-cars on track 3 by casting their shadow, and tend to obscure the view of the flat cars on track 4 rather than illuminate them. Aside from the testimony of the three wheelmen, there was also evidence warranting the jury in finding that when plaintiff listened on his approach to the crossing he heard nothing, in the fact that the cars had stopped; and that no cars were seen on track 4, when plaintiff was looking, for his attention would be attracted only by moving cars, and there were none moving, and, besides, his view was obstructed by ''the string of box-cars'' on track 3.

Upon the facts presented to the jury, as we have endeavored to state them, we are to determine the relative rights and duties of the parties to the controversy, guided by such settled rules of law as are applicable to this class of cases.

Appellant contends: 1. That "the special findings of the jury are inconsistent with the general verdict, and upon the special findings, under the instructions of the court, the defendant was entitled to judgment"; 2. "Upon the merits the defendant was entitled to judgment as the accident to plaintiff was the result of his own contributory negligence and want of care"; 3. That the court erred in giving a certain instruction at plaintiff's request.

The law requires no more of a person approaching a railroad crossing upon a public highway than that he use ordinary care to avoid injury; and ordinary care is such care as a reasonable and prudent man would use under the same or similar circumstances. It is a requisite to the exercise of ordinary care by one about to pass over a railroad crossing that he look and listen attentively both ways, and that if by so doing he could have seen or heard a train approaching in time to have avoided collision with it, and a collision occurs, a presumption arises that he either failed to look and listen or was heedless of what he saw and heard, in either of which events he is guilty of contributory negligence. The law also requires that in the exercise of ordinary care he must look and listen from a point where he can do so effectively. It is not ordinarily possible, however, to affirm, as matter of law, the precise number of feet from the crossing at which the traveler must look and listen, the underlying test being, Did the traveler exercise ordinary care in selecting the place?

The foregoing rules were clearly stated in *Baltimore etc. R. Co.* v. *Rosborough,* 40 Ind. App. 14, [80 N. E. 869]—a case having much analogy in its facts to the facts here—and we believe these rules to be a correct statement of the law, and as held also in this state.

It has been held that the traveler must. *stop* and look and listen, and defendant insists that this is what plaintiff should have done. So far as I have been able to discover, the first of the last above requisites is not a rule of law except, possibly, in the Pennsylvania courts. It has never been so held by the courts of this state. Circumstances may appear from which the duty would be cast upon the traveler, as a man

of ordinary prudence in the exercise of ordinary care, to stop before attempting to cross the track of a railroad, but it is with the jury to say from the facts of the particular case whether the traveler should have stopped. (See *White v. Southern Pacific Co.,* 122 Cal. 307, [54 Pac. 956]; *Bilton v. Southern Pacific Co.,* 148 Cal. 450, [83 Pac. 440].) The question was quite fully discussed in *Judson v. Central Vermont R. Co.,* 158 N. Y. 597, [53 N. E. 516]. We think the rule is there correctly stated. It was held that it is not, as matter of law, negligence for a person approaching a railroad in a carriage upon a highway to fail to stop, but that his omission to do so is a fact to be submitted to the jury. Referring to the case of *Kellogg v. New York Cent. etc. Ry. Co.,* 79 N. Y. 72, the court said: "The duties which rest upon a traveler attempting to cross a railroad are there stated, and it was in effect said that he was not bound to exercise the greatest diligence, but only such as a prudent man approaching such a place would ordinarily exercise; and that, even where he could probably have avoided the accident by stopping, he is not, as matter of law, required to do so, and that the courts of this state have so held; but, if he ought to stop, and he omits to do it, it is a fact to be submitted to the jury, with the other facts in the case bearing upon the question." To same effect is *Leavenworth etc. R. Co. v. Rice,* 10 Kan. 426; *Beanstrom v. Northern Pac. R. R. Co.,* 46 Minn. 193, [48 N. W. 778]; *Houston & T. C. Ry. Co. v. Wilson,* 60 Tex. 142; *Alexander v. Richmond etc. R. R. Co.,* 112 N. C. 720, [16 S. E. 896]; *Bunting v. Central Pac. R. R. Co.,* 14 Nev. 358.

Where the facts disclose no circumstances making it apparently unsafe or hazardous to attempt to cross a railroad track on the public highway without stopping (and this is true of most of the cases of this class), obviously a rule which would impute negligence, as matter of law, for not stopping in such a case, would be without reason. The court in the Kansas case, *supra,* very properly remarked: "The traveler on the highway is no more bound to stop when he approaches a railroad than the managers of a train are bound to stop when they approach a highway. It may be the imperative duty of either to stop when the conditions require it." It was there held error to instruct the jury that it was the duty of the driver of a carriage in which plaintiff was riding "to

*stop* and look up and down the track to see if there was a train approaching.''

The plaintiff was clearly within his rights in passing along Tulare street on his wheel and in crossing defendant's tracks to return to his home; he was traveling no faster than a man would walk; he looked and listened as he approached the tracks, saw no obstruction and heard no noise of a moving train, heard neither bell nor whistle; he crossed the main through track, also another track leading away from Fresno, crossed a switch, track 3, on which was a string of box-cars, obstructing his vision northward, and was within seven feet of track 4, on which he received the injury, all the time looking and listening, and hearing nothing and seeing nothing to indicate approaching cars. Two other wheelmen had reached like proximity to track 4, who, though they looked and listened, saw no moving cars and heard none moving, nor saw any light and heard neither bell nor whistle. Plaintiff neither saw nor heard the cars moving nor any light to indicate the presence of moving cars and no servant of the company was at the crossing. A single revolution of his wheel, the lapse of a second and a half of time, brought him to the point where he first discovered the threatening danger. He had no more reason to suppose that there was a moving train on switch 4 than on any other track he had passed. In fact, there had been none moving on track 4 from the time he approached the tracks until about the instant he was passing the box-car on track 3. If he had *stopped* and looked and listened, at track 3, he would probably have seen or heard the cars, but it cannot be said, as matter of law, that this was his duty. He did look and listen, and if he looked south first, as did Holderman and York, when he and they heard the switchmen hallo from that direction, as was the natural thing to do, he would have reached, as in fact he did reach, the east rail of track 4, in that fatal second of time, and before he could turn his head and look north whence the real danger approached. Finding himself on the track and the danger imminent, he resorted to the only means which seemed to him available to avoid injury.

It is true that our supreme court has held that the plaintiff may not rely upon the presumption that the railroad company will not be guilty of negligence. The rule is very strongly stated in *Hutson* v. *Southern Cal. Ry. Co.*, 150 Cal.

701, [89 Pac. 1093]. But we do not understand that the rule relieves the railroad company from all consequences of its negligence. It means that the negligence of defendant will not absolve plaintiff from the duty to exercise the usual and ordinary precautions required of a person about to cross a railroad track. I think that all the circumstances may be considered by the jury, including those which point to defendant's negligence, not as excusing contributory negligence on plaintiff's part, but as tending to explain his conduct of which the jury are to determine whether or not it, in fact, constituted contributory negligence.

It is possible that, had plaintiff clearly comprehended the meaning of the shout he heard after passing the box-cars on track 3, and had, in that fleeting second of time, seen or heard the cars approaching on track 4 at the instant he passed the box-cars, he might have thrown himself to the ground or vaulted from his wheel, and thus have averted the threatened danger, but he is not to be held to the exercise of unerring judgment under every stress of circumstance. We think, as was said in *Bilton* v. *Southern Pacific Co.*, 148 Cal. 450, [83 Pac. 440] : "He was only required to do what was reasonable under existing circumstances. . . . The case was undoubtedly one where the reasonableness of the effort to escape injury after the discovery of the danger was a question for the jury, to be determined by them in view of all the circumstances shown by the evidence."

The court said, in *Schneider* v. *Market St. Ry. Co.*, 134 Cal. 490, [66 Pac. 738] : "If the plaintiff is suddenly put into peril, without having sufficient time to consider all the circumstances, he is excusable for omitting some precautions, or making an unwise choice under this disturbing influence, although if his mind had been clear, he ought to have done otherwise. This is especially true if the peril is caused by the defendant's fault; and of such case it is said: 'Even if, in bewilderment, he runs directly into the danger which he fears, he is not at fault. The confusion of mind, caused by such negligence, is part of the injury inflicted by the negligent person.' "

The jury by their general verdict found that plaintiff was not guilty of contributory negligence, and this question was, we think, properly before them for determination. Was

this general verdict inconsistent with the special issues of fact found by them and was it in violation of the instructions of the court? The following instructions were given at defendant's request, and it is these that defendant insists should have entitled defendant to a verdict had they been followed:

"11. You are instructed that the law is well settled that the railway track of a steam railway must itself be regarded as a sign of danger, and one intending to cross must avail himself of every opportunity to look and to listen for approaching trains; and that if he sees a train or engine approaching upon the track, he must not place himself in a dangerous position by attempting to cross in front of it; and if, seeing the train or engine approach, he attempts to cross in front thereof, and an accident happens by which he is injured, no recovery can be had against the railroad company for such an accident.

"12. You are further instructed that one intending to cross a railroad track of a steam railway must avail himself of every opportunity to look and listen for approaching trains, and what he must do in such a case must depend upon circumstances. If the view is obstructed, he should take greater pains to listen for approaching trains. If, taking these precautions, he would have seen and heard the approaching train, the very fact of injury would raise the presumption that he did not take the required precaution. If, therefore, you believe from the evidence that if the plaintiff, by stopping instantly at any time when the train was in view of him, could have avoided the accident, then the accident occurred through the contributory negligence and want of care of the plaintiff, and your verdict should be in favor of the defendant.

"13. You are further instructed that if you find from the evidence that the plaintiff approaching the track upon which the accident occurred could have seen the cars in time to have avoided the accident, if he had stopped instantly, it was the duty of the plaintiff to so stop; and if you further find that instead of stopping at such time the plaintiff endeavored to cross in front of the approaching train and the accident occurred on account of such attempt to so cross, instead of stopping instantly, then the accident occurred from

the contributory negligence and want of care of the plaintiff and your verdict will be in favor of the defendant."

Instruction 11 is addressed to the conduct of a person who sees a train approaching while he is in a position to avoid the injury, which is not this case.

Of the instruction marked 12 this may be said: The jury were justified by the evidence in finding that plaintiff exercised the ordinary care required of an ordinarily prudent man in approaching the crossing, and were the judges of the question whether he took the proper precautions required of such a person. The latter part of the instruction is not clear as to its meaning. If by the terms "when the train was *in view* of him" plaintiff could have avoided the injury "by stopping instantly," the court meant to say when plaintiff first *saw* the train, and this, we think, is what the jury might have taken to be the meaning, the instruction is outside the evidence; for plaintiff did not see the train approaching until his front wheel was on the track, and to have then stopped instantly would have meant certain injury, if not death. If the terms "in view of him" meant that plaintiff might have seen the approaching cars under some possible circumstances, it is misleading and should not have been given. But we think the jury had a right to attach a meaning to the instruction such as would harmonize with the evidence and would not be inconsistent either with their general verdict or their findings on the special issues. And we think, too, the court must have had in mind the evidence in giving the instruction, and intended to convey to the jury by the terms "in view of him" the meaning that the train was actually in sight of plaintiff. The jury by their general verdict found that plaintiff at no time saw the train in time to avoid the injury by stopping instantly, and we see no inconsistency between the verdict and these instructions.

By instruction marked 13 the jury were told that if plaintiff "could have seen the cars in time to have avoided the accident, if he had stopped instantly, it was the duty of plaintiff to so stop." This is but saying that it would be negligence if plaintiff failed so to do. But the court also instructed the jury, and the instructions must be read together, that "negligence is always relative to some circumstance of time, place or person. It is the omission to do

something which a reasonable man guided upon those considerations which ordinarily regulate the conduct of human affairs would do, or the doing of something which a prudent and reasonable man would not do. It must be determined in all cases by reference to the situation and knowledge of the parties and all the attendant circumstances. . . . In order to absolve the plaintiff from the charge of contributory negligence, it is only necessary that you believe that he exercised ordinary care under the circumstances." Whether the plaintiff, in approaching the track upon which the accident happened, could have seen the cars in time to have avoided the accident by stopping instantly, was a question which the jury were to determine under all the circumstances appearing in the case. The jury found as a fact that he did not see the train in time to have avoided the accident and they found also that, considering all the circumstances, in approaching the train, he acted with ordinary care and prudence. Why, we may ask, was plaintiff called upon to stop instantly to avoid a danger which he neither saw nor was warned against, nor had reason to believe existed?

In considering the special issues we are to be guided by certain well-settled principles or rules of law. The code provides: "Where a special finding of facts is inconsistent with the general verdict, the former controls the latter and the court must give judgment accordingly." (Code Civ. Proc., sec. 625.) It was said in *Alhambra Addition Water Co.* v. *Richardson,* 72 Cal. 606, [14 Pac. 383] : "We do not think the court should strain the language of a finding to make out a case of conflict. The findings should be reconciled if it can reasonably be done, and be so construed *ut res magis valeat quam pereat*"—i. e., that the end may be promoted rather than destroyed.

Under the title, "Absolute inconsistency requisite to control," Mr. Clementson, in his recent work on Special Verdicts, at page 139 et seq., collects the rules and cites the authorities in their support. In *Union Traction Co.* v. *Vandercook,* 32 Ind. App. 621, [69 N. E. 486], it is said: "Authorities need not be cited in support of the proposition that the general verdict determines all material issues in appellee's favor; that all reasonable presumptions will be indulged in favor of the general verdict, and none indulged in favor

of the answers to the interrogatories; that if the answers are to control, they must be in irreconcilable conflict with the general verdict; that if the answers are antagonistic or inconsistent, they neutralize each other and will be disregarded; and that the answers override the general verdict only when both cannot stand, the conflict being such as to be beyond the possibility of being removed by any evidence admissible under the issues.'' Mr. Clementson says: ''The special findings must exclude every theory which will sustain the general verdict, and are inconsistent only when, as a matter of law, they will authorize a judgment different from that which the general verdict will permit.'' (Clementson on Special Verdicts, p. 139.)

Special issue 2 was a finding that no warning was given by anyone before plaintiff crossed the track. The only evidence of any circumstance indicating that a warning was given was the shout heard one hundred feet south and in the opposite direction from any danger. ''Warning'' is defined to mean ''previous notice; caution against danger'': Webster. The jury were the judges whether this outcry by someone unknown to plaintiff was understood, or ought to have been understood, by him to be a warning in the sense the jury had a right to apply the term.

Findings 1 and 4, read together as they should be, were that the accident could have been prevented if plaintiff had stopped instantly when he first reached a point where he could have seen the approaching cars (finding 1), which point was about seven feet (finding 2).

The jury having found, and upon sufficient evidence, as we have already seen, that plaintiff was not guilty of contributory negligence, there is no necessary or irreconcilable conflict between the finding and special findings 1 and 4. The jury said in effect by the special findings that when plaintiff was within seven feet of track 4 he could, by some possibility, have seen the approaching cars under some circumstances, and if, seeing the cars under those circumstances, he had instantly stopped the accident might have been averted. But the jury by their general verdict found that, under the circumstances, as they in fact appeared, he did not see the approaching cars and that if he had seen them he could not have stopped instantly. The special issues wholly ignore the

existing circumstances and are hypothetical. It is possible for the answers to be true and the general verdict also true.

It was said in *Baltimore etc. R. Co.* v. *Rosborough,* 40 Ind. App. 14, [80 N. E. 869] : "In an action for injuries received at a railroad crossing, the general verdict finding that plaintiff exercised due care was not overcome by answers to interrogatories showing that he could have discovered the danger in time to avoid it had he looked in a certain direction at a certain time, since the facts specially returned do not exclude the existence of circumstances warranting the conclusion that he exercised due care." (Syllabus.)

If it is reasonably possible to so construe the special findings of a jury as to sustain their general verdict, it must be done. (*Ready* v. *Peavey Elevator Co.,* 89 Minn. 154, [94 N. W. 444].) Both the general verdict and the special findings may be true, hence they are not inconsistent. (*Ibid.*) We think it is possible to give the special findings a reasonable construction so as to avoid any conflict with the general verdict.

The jury said in the special finding 5 that plaintiff did not approach track 4 in such manner that he could have stopped instantly. In the first place, plaintiff was not, under all circumstances, required to so approach the track, but the interrogatory implies that it was his duty to do so. We have shown that the duty to stop is relative to time, place and circumstances. The interrogatory does not relate to any particular distance from track 4 at which he failed to so approach this track. Furthermore, in answering the interrogatory negatively the jury may have taken the word "instantly" in its true meaning and yet consistently have found plaintiff free from contributory negligence.

In *Barrego* v. *Territory,* 8 N. M. 446, [46 Pac. 349], the indictment for murder charged that the deceased "instantly" died. The question was whether it was certain as to time and place. Said the court: " 'Instantly,' say lexicographers—those who define it etymologically, and those who give it legal meaning—implies 'without any intervention of time,' 'allows not a particle of delay,' 'makes an interval too small to be appreciated.' " I think it may be safely stated as within the knowledge common to all men, that in approaching a train on horseback, by carriage, by bicycle or other vehicle, to stop instantly, as that word is defined, would be impossible,

and we must, under the rules of law already stated, assume that the jury gave the word the meaning found in dictionaries, and so understanding its meaning, the jury might properly have found as they did by the general verdict.

The defendant complains of instruction numbered 7, which is as follows: "The plaintiff's right to recover is not affected by the fact that he may have contributed to his injury, if he was not in fault in so doing. If the plaintiff's share in the transaction was innocent and not incautious, it furnishes no excuse for the defendant. If you find that the plaintiff was suddenly put in peril by the negligence of the defendant, without having sufficient time to consider all the circumstances, he is to be deemed excusable for omitting some precautions or making an unwise choice under this disturbing influence; and even if you find that, in his bewilderment, being otherwise innocent of contributory negligence, he ran into danger by trying to cross the track ahead of the cars, such action on his part would not be contributory negligence."

Defendant contends that there is no warrant in law or in the evidence for this instruction. The instruction, we think, has much warrant in the evidence, unless what has been already pointed out in this opinion is unwarranted. The circumstances stated in the instruction as excusing plaintiff in some degree are made subject to the condition that plaintiff is "otherwise innocent of contributory negligence," and that his "share in the transaction was innocent and not incautious" and that he "was not in fault." We can discover no error in this instruction, and, besides, we do not think the jury could possibly have been misled to defendant's injury by this instruction. (See *Dufour* v. *Central Pacific R. R. Co.*, 67 Cal. 322, [7 Pac. 769]; *Harrington* v. *Los Angeles Ry. Co.*, 140 Cal. 521, [98 Am. St. Rep. 85, 74 Pac. 15]; *Bilton* v. *Southern Pacific Co.*, 148 Cal. 450, [83 Pac. 440].)

Many of the rules relied upon by defendant were laid down with reference to the circumstances surrounding each particular case, and often where the plaintiff was guilty of gross negligence, as in *Herbert* v. *Southern Pacific Co.*, 121 Cal. 227, [53 Pac. 651], the opinion speaks of plaintiff's conduct as a "reckless race with death"; "almost an act of madness." The effort should be to apply settled principles of law to the facts in the particular case as they existed at the

scene of the injury rather than determine the matter by matching cases.

The judgment and orders are affirmed.

Burnett, J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 25, 1909.