[Civ. No. 1229.  Third Appellate District.—June 23, 1914.]

## MARIA SOPHIA KOSKELA, as Administratrix of the Estate of Matt Gabriel Koskela, Deceased, Respondent, v. ALBION LUMBER COMPANY (a Corporation), et al., Appellants.

NEGLIGENCE—ACTION FOR DEATH OF STEVEDORE—COURSE OF EMPLOYMENT—ACCIDENT OCCURRING WITHIN.—In this action to recover for the death of a stevedore, he having gone ashore for supper from the vessel on which he was working, and having, on his return to the vessel to resume work, been drowned by being precipitated into the sea through the breaking of the "traveler" connecting the vessel with the wharf, it is a fair inference from the evidence that his contract of service included the transportation to and from the vessel by means of the "traveler," and that he was in the course of his employment when the accident occurred.

ID.—ACCIDENT TO EMPLOYEE—DOCTRINE OF RES IPSA LOQUITUR.—There being no contention that the employee was at fault, and the evidence showing that the thing which caused the accident was under the exclusive control of the defendants, and that the accident was such as in the ordinary course of events would not have happened had the defendants used proper care, the rule of *res ipsa loquitur* applies, a presumption of negligence arises against the defendants, and a motion for nonsuit is properly denied.

ID.—RES IPSA LOQUITUR—MEANING OF RULE OR MAXIM.—Under the rule of *res ipsa loquitur*, when a thing which caused an injury without fault of the injured person is shown to have been under the exclusive control of the defendant, and the injury is such as, in the ordinary course of things, does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of explanation, that the injury arose from the defendant's want of care.

ID.—JOINT LIABILITY OF OWNERS OF SHIP AND OWNERS OF LUMBER COMPANY FOR DEATH OF STEVEDORE.—If the vessel was being loaded with lumber, and the lumber company had loaned the stevedore to the shipowners to assist in the loading, and the "traveler" was in part owned by the lumber company and in part by the owner of the ship, and was jointly operated by and for their joint benefit, both are liable for the death of the stevedore, in the absence of evidence tending to show that the accident happened by reason of the fault of one only of them.

ID.—SPECIAL VERDICT—WHETHER NECESSITATES JUDGMENT FOR PLAINTIFF.—The contention of the defendants in this case that the special verdict of the jury necessitates a judgment in their favor, inasmuch

as it affirmatively appears therefrom that the plaintiff did not prove to the satisfaction of the jury that the defendants' negligence caused the stevedore's death, is not tenable.

ID.— GENERAL VERDICT—EFFECT AS IMPORTING FINDING FOR PLAINTIFF. A general verdict for the plaintiff and against the defendants imports a finding in favor of the plaintiff on all the averments of the complaint material to his recovery.

ID.—PRESUMPTIONS IN CASE OF GENERAL AND SPECIAL VERDICTS.—All presumptions are in favor of a general verdict for the plaintiff, and it must control if a special verdict is not absolutely irreconcilable therewith. On the other hand, answers to interrogatories cannot be aided by intendment, as all intendments are in favor of the general verdict.

ID.—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—DISCRETION OF COURT. The trial court did not commit reversible error in this case in denying the defendants' motion for a new trial on the ground of newly discovered evidence; the granting or denying of the motion being within the sound discretion of the court, and its action not being ground for reversal except when such discretion is abused.

APPEAL from a judgment of the Superior Court of Mendocino County and from orders refusing to vacate the judgment and refusing a new trial. J. Q. White, Judge.

The facts are stated in the opinion of the court.

Mannon & Mannon, for Appellants.

M. H. Iversen, and Preston & Preston, for Respondent.

CHIPMAN, P. J.—Action for damages resulting from alleged negligence of defendants through which plaintiff's intestate lost his life.

General and special demurrers to the amended complaint were overruled and defendants answered denying the material averments of the complaint alleging negligence and pleaded in defense unavoidable accident; that defendants had no knowledge of any defects in the appliances which it is alleged had been carefully inspected prior to their use and that the "accident was a casualty which no act of the defendants could have foreseen or prevented, and was caused through the breaking of a metal device of the loading apparatus, through a latent, unknown, undiscoverable defect in the metal thereof."

The jury rendered a general verdict and also a special verdict, as follows: "I. Did the wire cable give way by reason

of any defect in it? Answer: Don't know. II. If so, what defect? Answer: Don't know. III Did the wire cable give way by reason of any defect in the machinery or appliances by which it was supported? Answer: Yes. IV. If so, what defect? Answer: Don't know. V. Did the wire cable give way by reason of the careless or negligent manner in which the machinery or appliances supporting it were adjusted? Answer: Yes. VI. If so, in what way were the appliances or machinery carelessly and negligently adjusted? Answer: The jury does not think that the evidence locates the defect that caused the accident.''

Three appeals are prosecuted: 1. From a judgment in favor of plaintiff and against both defendants in the sum of ten thousand dollars. 2. From an order refusing to set aside the judgment and enter a judgment in favor of defendants on the special verdict rendered; and 3. From an order denying defendants' motion for a new trial. The evidence is brought up on bill of exceptions.

A diagram was used at the trial which we find necessary to an understanding of the facts in the case and is here inserted in this opinion:

The general statement of the case found in appellants' opening brief is conceded by respondent to be substantially correct ''for the purpose of getting the case before the court.'' We shall avail ourselves of this statement to some extent.

The defendant Albion Lumber Company has been for many years engaged in the operation of a sawmill at Albion in Mendocino County. As a part of its plant it owns and operates what is known as a "wire chute" at the end of a wharf by means of which a vessel lying off the wharf can be loaded with lumber or other forest products. At the time of the accident here in issue, the other defendant, Swayne & Hoyt, had under charter and was operating the steamer "Fulton" and by contract with Albion Lumber Company was transporting lumber and ties from Albion to other points. This "wire chute" is a device by which a wire cable is suspended between the wharf and the vessel to be loaded and on this cable runs a "traveler" (I) from which is suspended the load to be transported between the wharf and the ship (L–M). The traveler is drawn back and forth by means of a steam donkey engine located on the wharf.

The cable, traveler, engine and, in fact, everything belonging to the chute is the property of the Albion Lumber Company with the exception that the "falls" and "tackle" (J–K) by which the seaward part of the chute is raised and lowered is the property of the vessel which is then being loaded. The "main wire" (G) on which the traveler runs is really two cables joined together at the ship with a "toggle" or "hook" (B). The offshore end of the main wire (A) is permanently moored in the harbor and when not in use this part of the wire rests on the bottom.

On January 17, 1911, the steamer "Fulton" came into Albion harbor and went "under the wire" to load. Her crew, all employees of Swayne & Hoyt, drew up the offshore wire from the bottom and, by means of a running line, pulled out the main wire from the wharf and then joined the two ends of the wire together by means of the toggle (B) which was permanently attached to the free end of the offshore wire. As a part of making this wire fast the vessel's crew "moused," i. e., tied with small rope, the tongue of the tripper or toggle hook (B).

The loading of the vessel then proceeded by means of the chute and continued during the seventeenth day of January and all day of the eighteenth. At all times the employees of Albion Lumber Company had charge of the shore end of the wire and the employees of Swayne & Hoyt had charge of the vessel end thereof and attended to the storing away

of the cargo. Matt Gabriel Koskela, plaintiff's intestate (hereafter referred to as Koskela), had been working in the lumber yard of the Albion Company and in its employ. On the morning of the 17th, however, the master of the "Fulton" found himself short of stevedores and he therefore, with the permission of the Albion Company, employed Koskela in that capacity and the latter went to work on the "Fulton" in the employ of Swayne & Hoyt about noon on the 17th and continued in that employ until the accident.

About 5:30 P. M. on the 18th Koskela and another stevedore, called Jack Paavanen, having been working on the "Fulton" all day came ashore for supper. They reached the shore by riding on the traveler across the wire chute, as was the custom in going ashore and returning to the vessel. After these men came across, the wharf man slackened the main wire between the wharf and ship, so that it dropped to the bottom and another steamer which was lying at the wharf backed over the bight of the wire and then put out to sea. After this was done, the wharf foreman, Byrne, set the wire tight by pulling it up again and put it in a position to carry loads over to the vessel. He then ran the traveler out with no load more than half way to the ship in order to test the wire, and then ran it back to the wharf. In the mean time, Koskela and Paavanen had gotten their supper and returned to the wharf, as it was proposed to continue loading that evening.

When the wharf foreman gave the signal that everything was ready, Koskela and Paavanen took their places on the traveler to be transported back to the ship. The traveler was started out and when it had gone half way or a little less, the main wire dropped and caused the traveler with the two men to fall into the ocean. Paavanen was rescued but Koskela was drowned.

An examination of the apparatus after the accident showed that the triphook or toggle (B) holding the main wire together was entirely gone, together with the link (E) by which it had been fastened to the shackle in the end of the offshore line. The triphook and link disappeared either by falling into the water, as contended by appellants, or was thrown overboard by someone on the vessel to conceal their defects, as suggested by respondent. This triphook (B) was a massive contrivance more than twenty-six

inches long and the link at its offshore end was made of material one and a half inches in diameter. The operation of the triphook (B) can be understood from the diagram if it is remembered that there is a hinge in it just where it bears against the eye and thimble (N). Unless the tongue (P) is fastened down with the link or shackle (H) the triphook will open and no longer hold the apparatus in position.

This action was brought against the two corporations to recover damages because of Koskela's death. The amended complaint alleges that Koskela's "death was caused by the negligence of said defendants committed as follows: . . . the said wire cable by reason of the defects in the machinery and appliances by which the same was supported and by reason of the careless and negligent manner in which said machinery and appliances were adjusted, gave way and the deceased without fault on his part was . . . instantly killed.' That said death of said deceased was the direct consequence of the defective and imperfect appliances and machinery of defendants and the negligent and careless manner in which same were used and adjusted as above set forth, which said defects were well known to the defendants and each of them and were unknown to the plaintiff. The said defendants ordered the deceased to undertake said journey to said vessel, well knowing that the said machinery and appliances for taking him there were defective, insecure, unsafe and dangerous and also well knowing that said machinery was adjusted in a careless and negligent manner.''

Witness, George Olsen, called by plaintiff, was at the time the Albion Lumber Company's foreman on the wharf. He testified, in explanation of the operation of the apparatus, that when not in use the entire offshore wire from the thimble "N" and including the links of the small chain "Q," were dropped into the sea and rested at the bottom. "When the steamer is unloading and you trip the wire, this is untripped first (witness here indicates on diagram hook marked 'C') and this block (witness here indicates block marked 'D') and the little wire ('S') goes ashore, then you trip the big wire and the trip and this whole thing (witness indicates wire and trip marked 'A' 'B') goes overboard. The end of this wire marked 'A' is under water too." He testified further that two or three months before the accident he assisted in

overhauling the apparatus. He testified: "It was my duty to see that the rigging was in good order. These two wires (offshore wire 'A' and inshore wire 'G') are fastened together in this way: You pull the inshore wire out to the boat and raise it up and slip that triphook ('B') through the eye ('N') of the inshore wire. After putting that link marked 'H' on there they place a 'mousing' on outside that. I don't know whether that was done on that day of the loading of this vessel. I did not consider it a part of my duties to see whether that was fastened together right or not. On the day the steamer began to load I didn't fasten it, I was not aboard the boat. . . . We had some trouble with a part of the wire or the rigging of the vessel on the day before the accident." Over defendants' objection he was permitted to explain the trouble: "The hook and this block here (indicating on diagram hook marked 'J') gave way and dropped the wire out aboard the vessel while the traveler was out there, and split the woodwork on this traveler here. . . . This block here (indicating block marked 'K') belonged to the steamer; it is used to hoist the wire up and down and this hook and block both here (indicating 'J' 'K') that belongs to the steamer but the block there (indicating block marked 'D') belongs to the wire. It was this hook here on this block (marked 'J') which broke." He testified that the next morning they began to load the vessel; ran the traveler out to see that it would work; did not examine to see whether the hook arrangement belonging to the vessel had been fixed; there might have been some little sling trouble at the vessel the day of the accident but he was not certain. He testified that he went aboard the vessel about a half an hour after the accident and found the end of the inshore wire uncoupled from the offshore wire at the connection with the triphook or toggle "B," and "hanging in the rigging of this thing—right in the rigging (indicating on diagram point marked 'J') . . . and the eye of this wire was right here in this block (indicating on diagram point marked 'D'). The weight of this inshore wire would naturally pull it toward the shore. . . . The offshore wire was not there at all. This bumper ('D') was hanging right over the vessel. I did not find anything with reference to this triphook (marked 'B'). Something was said about looking after it. I did not look for the offshore end of the wire or the coupler at this time of night." It appeared that when Kos-

kela started to return to the vessel it was at the hour of about
7 P. M. and it was quite dark and "raining slightly." He
testified that he proposed to look for the coupler. "Q. Who
did you propose it to? A. To the captain. Q. How was it
you didn't look? A. Because the captain said it was too
dark and did not want to look for it." The foregoing ques-
tions and answers were given over defendants' objection.
"I did not hear any statement made by the captain as to what
had become of the coupler." He testified that he examined
the outside or offshore wire the next morning and found noth-
ing on the end except the shackle or clevis "F." "The rest
was gone," i. e., "B" "E," from that point to the eye or
thimble at the end of the inshore wire. He was not certain
whether the tripper "C" was there. The shackle or clevis
"F" was not broken and nothing on it showed a strain.
"Nobody dragged the ocean or sent any divers down to find
that hook. I didn't look for it. I didn't see anybody else
look for it. I have not seen the coupler since the accident."
He explained that the office of the little chain and tripper
"C" was to hold the strain from the traveler "I." He got
all of this chain and the tripper after the accident but "could
not tell whether it was on the end of the inshore or outshore
wire. He also testified that the "mousing" ("R") was rope
wound around the shackle "H" "and is always put on when
you put the wire out. Every time you put the wire out it is
customary to put on new mousing."

Witness Paavanen (Pavnen) was Koskela's companion and
was on the traveler with Koskela when the latter was drowned.
They had gone ashore for supper and were, as directed to do
by the captain of the vessel, returning to continue the work
that night. His description of the accident is not material.
He testified that during the day he worked, the 18th, "some-
thing broke about the rigging of the vessel." Over objection
he was permitted to describe what happened. "This pulley
broke off (indicating on the diagram marked 'K') and this
whole thing (indicating traveler, bumper and wire tripper)
broke down into the hold of the vessel and broke the frame-
work and then they had to fix it. Q. Did that break let
the wire down? A. Yes, sir. I do not remember what time
of day this break was but I thought it was in the forenoon.
It was a couple of hours before they fixed it up. . . . After
they fixed it we loaded more lumber or ties that day. I am

also positive that it was the same day that I fell into the ocean. While they were fixing this traveler, they uncoupled the two wires. They had a rope around here in this block (indicating mousing on diagram.) Somebody took a knife and cut the rope off and then lifted this hook (indicating point 'B') and unhooked it. I didn't see him put this rope back. I didn't see them couple the wire back. I don't know whether they put the rope back on it or not. . . . They were hauling about fifty ties at a load across there on that day. Ties weigh from 100 to over 200 pounds. They were not carrying any load at the time Koskela and I got on the traveler. . . . There was nothing on the traveler to carry except we two men.''

Witness Johnson was working ''longshore'' on the ''Fulton'' and saw ''the wire go down'' at the time of the accident. He testified: ''I know what shape the coupler part that couples the two wires together was in that day. It was in good shape and was tied. I don't know whether it was tied at the time of the accident. At the time I jumped out of the way. . . . All of the crew was around there when I jumped. I did not see this coupler after the wire fell. The wire didn't go quite overboard, the whole thing stood on top of the railing. I didn't see the offshore wire. I didn't look or help them look for the end of the wire that night. I didn't help them look for the coupler. I didn't hear anybody say anything about the coupler. I didn't hear the captain say anything about this machinery or any part of it but when we was loading he told us to keep out of the way, that is all he said. He told us to keep out of the way, 'it ain't very safe around the load,' that is all I heard him say—that it was not very safe around there.'' He testified that he saw the captain go ashore on the wire and return with the load a dozen times that day. ''He told us it would not be safe every time he was aboard the ship. When he was not there the mate told us. He never mentioned what was the matter. Neither the mate nor anybody else ever told us what was the matter.'' On cross-examination he testified: ''When a load of ties goes out there on the steamer and as it goes over the vessel it swings back and forth considerable. It always does. It is sure dangerous to stand around in the way of that and have it strike you.'' On re-examination he testified: ''The captain and the mate surely made an examination of the rigging of the vessel in my presence while I was there that day. I don't

know how many times they did that. . . . He didn't say it would not be safe while he was looking at that but while he was running loads. He said the same thing every time but he didn't tell me what it was that would not be safe.''

Plaintiff rested her case at the close of Johnson's testimony and defendants moved for a nonsuit which was denied. The motion presents certain questions which may as well be decided at this point as elsewhere. The grounds of the motion were: That the evidence does not show that Koskela was in the employ of either of defendants when the accident occurred; that it does not tend to prove negligence of either of the defendants or that deceased in the course of his employment was directed by defendants or either of them to get upon the traveler; or that the cable gave way by reason of any defects therein; or that it gave way by reason of any defect in the appliances or in the negligent manner of operating the machinery; or that there were any defects in the machinery or its adjustment.

There was evidence that the deceased was told by the captain of the vessel to return after getting his supper; that the traveler was used for transporting the workmen and that when deceased returned from his supper to the wharf and the cable was ready for use the lumber company's foreman said to deceased and his companion, Pavnen: ''Hurry up and get on that traveler.'' It is true that there is no evidence that deceased was under pay while at his supper or while he was returning on the cable. Strictly speaking, he may not have been at the time in defendants' employment. But we think it a fair inference from the evidence that the contract of service included transportation to and from his place of work by the very means through which he lost his life and we think that the same rule should apply as would have been applicable if, without fault of his, he had been injured by the breaking of the cable while at work on the vessel. And that brings us to the question whether the circumstances thus far disclosed afforded reasonable evidence of want of care on defendants' part sufficient to require explanation by them. The rule or maxim, *res ipsa loquitur,* is stated as follows: ''When a thing which caused the injury without fault of the injured person is shown to be under the exclusive control of the defendant, and the injury is such as, in the ordinary course of things, does not occur if the one having such control uses proper care,

it affords reasonable evidence, in the absence of explanation, that the injury arose from the defendant's want of care." (*San Juan Light & Transit Co.* v. *Requena,* 224 U. S. 89, 99, [56 L. Ed. 680; 32 Sup. Ct. Rep. 399] ; *Hill* v. *Pacific Gas & Elec. Co.,* 22 Cal. App. 788, 790, [136 Pac. 492].) It is not contended that deceased was at fault and it seems to us that the undisputed facts show that the thing which caused the injury was under the exclusive control of the defendants and that the injury was such as in the ordinary course of things would not have occurred had defendants used proper care. The appliances for loading vessels were such as were in ordinary use and, presumably, had been adopted by defendants as proper and suitable for the purpose designed. It is inconceivable that defendants would have adopted these means had they supposed that in the ordinary course of their operation, with proper care, such accidents as the one here were likely to occur. It is not necessary to refer to the many and great variety of cases in which the rule has been applied, to show that the present case comes plainly within its operation.

Nor have we any doubt upon the remaining question presented by the motion—namely—whether or not defendants were jointly liable, if liable at all.

Appellants contend that "the rule *res ipsa loquitur* does not and cannot apply, for the reason that there cannot, under any view of the evidence, have been a joint liability by the defendants and the evidence leaves it impossible to determine which if either defendant is liable."

The appliances used were in part owned by the lumber company and in part by the shipowners. All of these parts constituted the means of transportation and were necessary to each other. It was also necessary that both parties should assist in the operation of the appliances, and they were jointly operated by and for the joint benefit of both defendants. In the absence of evidence tending to show by one of the parties that the accident happened by reason of the fault alone of the other for which the former was in no sense responsible, we think it must be held that both were liable.

Appellants cite *Harrison* v. *Sutter St. Ry. Co.,* 134 Cal. 549, [55 L. R. A. 608, 66 Pac. 787]. In that case the injury was to a passenger riding on a street car and was caused by its colliding with a brewery wagon belonging to the National

Brewing Company.  Both companies were made defendants
and the contention was that, under the rule of *res ipsa
loquitur*, a presumption of negligence arose against both par-
ties.  The court, speaking of this principle, said: "In the very
nature of things it cannot be made to apply in favor of a
plaintiff seeking to recover damages for injuries against two
defendants wholly independent of each other, it being an open
question as to which defendant had control of the particular
instrumentality that caused the injury."  Appellants, in
their quotation, omit to add the further statement of the
court: "If it were a conceded fact in such a case" (or, we
may add, appeared from the evidence) "that the instrumen-
talities of both defendants caused the injury, probably the
principle could be applied, but not otherwise."  The undis-
puted evidence was that this very situation existed in the pres-
ent case.  The motion for nonsuit was rightly denied.

Captain Jacobson, master of the steamer "Fulton," was
called by defendants and testified that he assisted in adjusting
the appliances aboard ship.  "When we got this tripper up
on deck I was right there and saw all of it and there was no
visible defect.  That tripper did not go back in the water
between that time and the time the accident happened.  We
didn't load any more that night."  He testified that "once
the hook up above gave way" and also "the chain (marked
'Q' on diagram) that takes the strain of the carriage"; these
"were fixed and we kept on loading."  He testified that he
had to wait for the steamer "Pomo" to go out and he told
deceased and Pavnen to go and get their supper; that the
bumper and the whole business was sent ashore and the in-
shore wire was let down to the bottom of the sea and the
"Pomo" went out over the wire.  "I was on deck when this
was done.  Then we started up again.  We sang to them on
shore to heave tight the big wire and then after that we got
out the small line. . . . Then we rigged up our single and
double donkey falls, the big wire was there already.  We did
the same as we had done before except that we had the main
wire ashore."  He saw the bumper sent out part way and
then went into his room.  "I was in my room at the time this
accident happened.  I went out immediately and when I got
out there I found this here (indicating bumper and end of in-
shore line on diagram) hanging shoreward from the deck.  I
found all the rigging except that none of the offshore wire was

on the vessel. I think the water there is somewhere around three or four fathoms deep.'' He testified that George Olsen was not there that night and that no one came from the wharf that night. Olsen's testimony is already given to the contrary. He testified that the next morning they got up the offshore line and there was nothing on it but the thimble or eye (marked "O" on diagram). "The tripper and the link and everything was gone, there was nothing left but just this tymbal'' (properly called thimble). He explained that all his then crew were elsewhere employed at the time of the trial and none of them testified except the captain. Concluding his testimony in chief, he said: "We didn't examine the tackle of the ship; that we took for granted was O. K. The tackle was hooked up on that day, if it was hooked up property (properly). I was over the wire myself on the day of the accident I should think a dozen times. I rode back and forth, out on the load and back empty.''

On cross-examination he testified: "It was customary for the employees and longshoremen to go back and forth on this traveler; that is the way they always did.'' He denied that the "mousing" was cut that day or that the wires had been separated and claimed that the breaking of the bumper and hook was the day before. The only explanation given by the witness as to his theory of what caused the accident was on his cross-examination and was as follows: "The night this man was drowned that link must have broken'' (indicating link marked "E" on big tripper) and his reason given was— "because the tripper was not there. . . . I didn't make any investigation to see which way the triphook fell over. No one saw it. I didn't see the triphook. I don't know which side it went over on. If it had fallen in the boat I would have seen it.'' He denied telling any of the men that the machinery was not safe. He told them when a load came out "to stand clear.'' He testified: "There was nothing the matter with any machinery such as the traveler or the dumping block that I knew of. . . . It had been about thirty hours since I examined the mousing. . . . It is the universal custom on all of these chutes for the vessel to make fast the two wires. We have no assistance at all in making it fast. We have men enough to do it ourselves.''

Witness Byrne was called by defendants. He was the engineer handling the inshore end of the wire. He testified that

they had trouble with the bumping block the day before the accident but he didn't know of any other trouble. He was told by Olsen to send the longshoremen out; he tested the wire after the "Pomo" went out. "After I brought the traveler back and the two got on I started my engine—threw my clutch in and ran probably a third of the way out or possibly half of the way when everything dropped." He explained that he had a rope or yarn tied around the wire to indicate when he had the wire taut. "When everything dropped I thought my mark might have slipped or something so I examined that the first thing and found it where it belonged. It showed the main wire was not too tight. Of course, in setting that wire up it is difficult at night and we go by that mark."

On cross-examination he testified: "The weight of an ordinary load of ties on the carriage would be probably three ton, from two to three tons, and at the time these men were out there was nothing at all on there except the two men. There was no reason that I know of why the toggle should break. Everything was in good order as far as I knew. There was no particular weight to these men to make it break when it had held up big loads before."

Pavnen was recalled for cross-examination and testified that it was the evening before the accident that "the mousing on the big tripper" was cut and that both he and Koskela worked there on the 17th and 18th.

Witness McKee testified for defendants as an expert in operating wire chutes. His testimony related to chutes at other places and the custom in their operation. We cannot see that his testimony throws any informing light on the case here. Of the wire chutes with which he was familiar he said: "It is not an unusual thing for some part of the rigging to carry away."

Olsen was recalled and stated that it was the bumper and not the traveler that broke the night before the accident and that the main wire was tripped that night. Witness Miller gave some expert testimony in rebuttal as to the proper construction of these wire chutes but we do not think it important to state his opinions.

We have endeavored to give so much of the testimony, perhaps more than necessary, as would fairly present the salient facts in the case.

Reviewing the facts as shown by the testimony, we start with the presumption of negligence, i. e., that, under the rule *res ipsa loquitur*, there was reasonable evidence that the injury arose from the defendants' want of care. This alone, without considering specific facts indicating negligence, of which respondent claims there are many, would sustain the general verdict in the absence of satisfactory explanation by defendants of the cause of the injury exculpating them from responsibility therefor. And the sufficiency of the facts constituting such explanation was for the jury to determine. It is difficult to conceive of appliances that had during the day carried safely many loads of two or three tons weight suddenly, without fault of the operators or of the appliances themselves, breaking down under a load of three hundred pounds. If the accident was susceptible of an explanation consistent with the assumption that the appliances were adequate and their operation by defendants without fault the burden was upon defendants so to show to the satisfaction of the jury. The only member of the vessel's crew who testified was the master, Captain Jacobson, and in his testimony in chief he made no explanation whatever of the cause of the accident. In his cross-examination the only suggestion made by him of a probable cause was that the "link must have broken (indicating point marked 'E' on diagram) because the tripper was not there." It is possible that this link broke, if it did break, by engineer Byrne's having put a tension on the main wire to the breaking point when he sent the deceased out on the traveler. He was guided by a mere rope tied around the cable which at first he thought had slipped, thus leading him to put too great a strain on the cable. It is not improbable that unwittingly he did this. However, it is not for us, nor was it for the jury to speculate upon the cause of the breakdown. It was for defendants to make the explanation and this, we think, they failed to do.

Appellants contend: "That the special verdict of the jury necessitates a judgment in favor of defendants, inasmuch as it affirmatively appears therefrom that the plaintiff did not prove to the satisfaction of the jury that the defendants' negligence caused Koskela's death."

There was a general verdict for plaintiff and against defendants. The rule is that the general verdict imports a finding in favor of plaintiff on all the averments of the com-

plaint material to his recovery. (*Merritt* v. *Wilcox,* 52 Cal. 238, 242.) ''The presumption is that the general verdict covers findings in plaintiff's favor upon all the facts necessary to be proved under the issues not covered by the findings.'' (Clementson on Special Verdicts, p. 135.) And all presumptions are in favor of the general verdict for the plaintiff and it must control if the special verdict is not absolutely irreconcilable therewith. (*Antonian* v. *Southern Pacific Co.,* 9 Cal. App. 718, 731, 732, [100 Pac. 877].) On the other hand, answers to interrogatories cannot be aided by intendment, as all intendments are in favor of the general verdict. (Clementson on Special Verdicts, p. 134.) And a special finding must be limited and controlled by its specific terms. (Id.) Special verdicts cannot control a general verdict unless consistent with each other, are not uncertain and are free from obscurity. They cannot destroy the general verdict, if at all, except by their own inherent strength and clearness. (Id., p. 135.) Obviously, as the general verdict is an express finding for plaintiff on all material issues it should not be overthrown unless the special findings are utterly at war with it. We have seen that the jury were warranted in finding the defendants guilty of negligence from which the injury resulted. We do not think it affirmatively appears from the special verdicts that plaintiff did not prove that defendants' negligence caused Koskela's death. *Res ipsa loquitur.* Special interrogatories I and II were not answered and need not have been because plaintiff was not required to locate the particular defect in the wire cable. The jury did answer that the cable gave way by reason of defects in the machinery or in the appliances supporting it. (Interrogatory III.) But it was not required of the jury specifically to locate the defect. The jury also found that the wire gave way by reason of the careless and negligent manner in which the machinery or appliances supporting it were adjusted. (Interrogatory V.) These were findings of negligence and respondent, we think, pertinently remarks: ''Does this not exclude the idea of latent or undiscoverable defect? If the cause lay in the negligent manner in which this machinery was adjusted, the cause could not be a latent or undiscoverable defect. Negligent adjustment is not a latent defect.'' Interrogatory VI invited an answer in what way were the appliances or machinery negligently adjusted? The answer

must be limited to the scope of the question which called for an explanation by the jury of the specific defect in the manner of adjusting the appliances which caused the accident. This the jury were unable to do. As shown, the happening of the accident under the circumstances and the death of deceased without his fault resulting therefrom established defendants' negligence. The jury found specifically that the cable gave way by reason of a defect in the machinery and appliances supporting it and also by reason of the negligent manner in which they were adjusted. We must, if we can, under the rules stated, so construe the failure to answer interrogatory VI, as to be consistent with the answers just referred to. Besides, we do not think any inconsistency arises between this answer and the general verdict and the specific answers III and IV; nor, in our opinion, was an answer locating the defect necessary to the giving of full force to the general verdict.

We find no prejudicial error in any rulings of the court on the admission of evidence.

The motion for a new trial was further urged on the ground of newly discovered evidence and was supported by the affidavit of John Tietjen, mate of the steamer ''Fulton'' at the time of the accident. His affidavit shows that he was present and assisted in adjusting the appliances and operating them. It is in greater detail and in some respects more specific than the testimony of Captain Jacobson, but is quite similar and, while corroborative and in that sense important, it was in large degree cumulative. He does not explain the cause of the accident nor does he state facts which if believed would necessarily rebut the evidence of negligence. He states that he ''would have attended the trial on July 11, 1912, if he had had notice.'' Affiant Moran, manager of Swayne & Hoyt, deposed that he was notified, on June 24, 1912 (the case was set on June 20), that the case had been set for trial July 11, 1912, and that he immediately ''set about procuring Tietjen's attendance'' and traced him aboard the steamer ''San Pedro,'' June 30, 1912, bound from San Francisco to Eureka and finally succeeded in obtaining information from the San Pedro's agent that she would arrive at San Francisco on July 9th and that he, the agent, would employ a substitute mate, relieve Tietjen and send him to Ukiah on the 10th; that affiant relied on this promise and notified the defendants'

attorneys that Tietjen would be at Ukiah on July 10th, not later than the 11th.   It turned out that the ''San Pedro'' did not arrive at San Francisco until July 18th.   No application was made to postpone the trial for the reason, as deposed by attorney Mannon, that he could not assure the court that he would be able to secure Tietjen's attendance nor state where he was.

Attorney Preston, one of plaintiff's attorneys, deposed that the cause was at issue in February, 1912, and the case was called up to be set for trial about March 11th and was set down for trial for April 25th but on April 8th the order was vacated and the cause regularly continued from week to week to be reset until May 27th when the trial date was fixed for June 27th and at the request of defendants the cause was again postponed until July 11th at which date the trial began; ''that no application for a postponement was made on said last named day or at any other time.   That John Tietjen does not reside in the county of Mendocino nor did he reside at a place where he could be forced to attend trial by subpoena.'' There is no reason given why Tietjen's deposition was not taken except as may be inferred from the fact that Mr. Mannon was notified by Swayne & Hoyt that all the witnesses, including Tietjen, would be in attendance.

The granting of the motion, under the circumstances, was within the sound discretion of the court and it is only where such discretion has been abused that its order will be reversed. (*People* v. *Urquidas,* 96 Cal. 239, [31 Pac. 52].)

Tietjen's evidence cannot be said to be newly discovered. It was well known to the defendants that he was present and acting as mate of the ''Fulton'' when the accident happened. Knowing as early as March that the cause was called up to be set for trial defendants had ample time to assure themselves of the attendance of their witnesses but it was not until June 24th that any effort was made to ascertain Tiejten's whereabouts.   Swayne & Hoyt, being engaged in the coastwise shipping, had the means of learning who constituted the crews on coastwise vessels.   Defendants' attorneys were justified in relying on their clients to secure the attendance of necessary witnesses and defendants cannot be heard to complain of their own want of diligence.   Had they made timely inquiry and learned that this witness could not be found or, if found, was so situated as to make it doubtful whether he

could attend the trial, the attorneys should have been so notified and given an opportunity to move for a postponement before the trial began. We cannot say that the court abused its discretion in denying the motion.

The judgment and orders are affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 22, 1914.