[L.A. No. 30536. May 31, 1977.]

JAMES HASSON, a Minor, etc., et al., Plaintiffs and Appellants, v. FORD MOTOR COMPANY et al., Defendants and Appellants.

DENNIS A. SAVAGE, a Minor, etc., et al., Plaintiffs and Appellants, v. BEVERLY LINCOLN-MERCURY, INC., et al., Defendants and Appellants.

**COUNSEL**

Harney, Bambic & Moore and David M. Harney for Plaintiffs and Appellants.

Dryden, Harrington & Swartz, Richard A. Foxx, Peter Abrahams, Waters, McCluskey & Corcoran and Laurence R. Corcoran for Defendants and Appellants.

## Opinion

**RICHARDSON, J.**—In these consolidated products liability actions, defendant Ford Motor Company (Ford) appeals from a judgment following a jury verdict favorable to plaintiffs. Plaintiffs appeal from a judgment notwithstanding the verdict in favor of defendant Beverly Lincoln-Mercury, Inc. (Beverly), and Beverly maintains a protective appeal of the jury verdict against it. We consider among other questions (1) whether a general verdict was fatally inconsistent with a special finding of the jury, and (2) whether error occurred in the failure of the trial court to instruct the jury on the issue of contributory negligence. As to all plaintiffs except James Hasson (hereinafter James), suing through his father and guardian ad litem Jack Hasson (hereinafter Hasson), we' will affirm the judgment against Ford and reinstate the jury verdict against Beverly. However, since we will conclude that the trial court erred prejudicially in declining to instruct the jury on the possible contributory negligence of James, we reverse the judgment as to him.

In the early evening of July 19, 1970, James, a 19-year-old first-year college student, was driving a 1966 Lincoln Continental automobile owned by his father Hasson. Four other young people were passengers in the car. As the vehicle descended the steep grade of Mt. Olympus Drive in Los Angeles the brakes failed and the car crashed into a fountain. James suffered permanent brain damage and other serious injuries resulting in permanent total disability. The other passengers were not seriously hurt.

Defendant Ford manufactured the vehicle. Defendant Johnson and Son (Johnson) was its original retail seller, Hasson having later purchased it as a used car from a third party, and defendant Beverly last serviced the vehicle before the accident. James, through his guardian ad litem, and all of the other occupants of the car sued for their injuries. Hasson sought separate reimbursement for medical expenses incurred on James' behalf. Causes of action in both strict liability and negligence were alleged against each of the defendants. The strict liability theory was ultimately not pursued against Beverly.

The underlying theory of the complaint was that the accident and the resultant injuries had been caused by a brake failure resulting from a heat-induced vaporization of the brake fluid. Plaintiffs' principal charging allegations were that Ford, in manufacturing the vehicle, had improperly installed a brake fluid the vaporization temperature of which

lowered dangerously in use; failed to warn dealers of the need to replace the fluid periodically; improperly designed the braking system so as to permit excessive heat transference to the fluid; and failed to provide a back-up braking system (the so-called "dual master cylinder" design). The claim against Beverly was founded on allegations that Beverly was negligent in failing to replace the fluid when it serviced the car.

At trial plaintiffs relied primarily on the testimony of three expert witnesses to establish both the cause of the accident and defendants' responsibility therefor. These witnesses based their conclusions upon several factors including the apparent circumstances of the mishap, a laboratory analysis of the brake fluid in the Hasson car, their examination of components of the vehicle's braking system, the results of braking tests administered to another 1966 Continental, and the experts' evaluation of the car's brake system design.

No brake difficulties had been experienced with the Hasson vehicle within recent years. Trial testimony revealed that before James and his friends began their ride the car had not been driven for several hours, but at the time of the accident it had been operated for approximately one-half hour in moderately heavy suburban traffic. It had stopped or slowed several times in traffic, on downgrades, and at scenic overlooks. The passengers testified that the vehicle's speed during this period had never exceeded 40 miles per hour and was usually slower. The general temperature of the air was in the eighties. According to all of the passengers, James attempted to slow the vehicle as it proceeded down Mt. Olympus, but without advance warning the pressing of the brake pedal to the floor did not reduce the car's speed. James then tried to use the emergency brake and to shift the car into reverse to slow it, but these measures were also wholly ineffective.

Two investigating officers tested the brake pedal within 45 minutes after the accident and both of them found application of force to the brake pedal resulted in firm and normal pressure. No skid marks were found.

Testimony of the experts on both sides focused on the nature of the vehicle's brake fluid. The boiling point of the fluid initially installed by Ford in 1966 Lincoln Continentals was 550° F. Containers of this fluid carried a warning from Ford that use in the 1966 Lincoln of fluids composed of chemical formulae different from that first used in the car could result in brake failure because of variances in the boiling point of

various liquids. Ford representatives testified that the high initial boiling point of the factory-installed fluid was desirable for safety reasons.

Examinations of the particular brake fluid removed from the Hasson vehicle after the accident revealed that it was "hygroscopic"—that is, in use, it readily absorbed contaminants such as water vapor. This contamination of the fluid caused a progressive reduction of the temperature at which it boiled and vaporized. These tests, unchallenged by defendants, also disclosed that the fluid was, dark in color, further indicating the presence of impurities, and that the liquid's boiling point had fallen to approximately 300° F. This corresponded to a vaporization point of 275° F. to 280° F. Further, the fluid was found to contain approximately 5.1 percent water. This degree of contamination could produce a vaporization point as low as 248° F.

All expert witnesses agreed that the boiling point of the brake fluid initially installed in the Hasson car would have been sufficient to prevent vaporization under the conditions encountered by the vehicle and that the general brake system was safe for normal operation if the original factory-recommended fluid was used. There was no evidence that Ford ever specifically warned either dealers or customers that a failure to replace the brake fluid periodically might cause brake malfunctions.

Both Ford and Beverly denied fault and contended, alternatively, that no brake failure had occurred, or that if one had occurred, that it was due to James' sole or contributory negligence. Defendants relied primarily on the conclusions of Ford's experts, based upon their examination of the Hasson vehicle's braking system and the results of various experimental tests conducted by them.

The jury found against all defendants except Johnson and awarded damages totalling $1,123,840.04. The trial court denied Ford's alternative motions for judgment notwithstanding the verdict or new trial but granted a judgment notwithstanding the verdict for Beverly.

We consider the issues.

1. *Inconsistent Verdicts*

Code of Civil Procedure section 625 provides: "In all cases the court may direct the jury to find a special verdict in writing, upon all, or any of the issues, and in all cases may instruct them, if they render a general

verdict, to find upon particular questions of fact, to be stated in writing, and may direct a written finding thereon. . . . *Where a special finding of facts is inconsistent with the general verdict, the former controls the latter, and the court must give judgment accordingly."* (Italics added.)

Pursuant to section 625, and over the objections of all parties, the trial court submitted special interrogatories to the jury. Among them were the following:

"1. In these cases, were any of the following defendants negligent?

 a. Ford Motor Company:   Yes _____ No _____

 b. Johnson & Sons:    Yes _____ No _____

 c. Beverly Lincoln:    Yes _____ No _____

"2. If nine or more jurors voted Yes to interrogatory Number 1 as to any defendant, with respect to that defendant was any such negligence a proximate cause of injury and damage to the plaintiffs? [Yes-No alternative repeated for each defendant.]

"3. Was there a defect in the 1966 Lincoln Continental automobile involved in the accident of July 19, 1970, existing at the time it was manufactured and sold by defendants Ford and Johnson & Sons?

 Yes _____ No _____

"4. If nine or more jurors voted Yes to interrogatory number 3, was such defect a proximate cause of injury and damage to the plaintiffs?

 Yes _____ No _____ "

In response to interrogatory No. 1, the jury voted nine to three that both Ford and Beverly had been negligent, but unanimously found that Johnson had not been negligent. Interrogatory No. 2, relating to proximate cause, was answered in the affirmative by a similar nine to three vote. As to interrogatory No. 3, however, 11 jurors voted that there had been no "defect" in the Hasson vehicle "at the time it was manufactured and sold."

Ford perceives an inconsistency between the special finding of "no defect," at the time of manufacture and original sale, on the one hand, and the special finding of "negligence" and the general verdict for plaintiffs, on the other. This requires, according to Ford, a judgment in its favor under section 625.

Ford argues that the evolving modern law of strict liability based upon a "defect" of design or manufacture encompasses all of the conceptual bases which would give rise to a traditional common law liability for negligence of a manufacturer. In effect, the newer law subsumes the old. Accordingly, Ford contends, a special finding that there was no "defect" obviates any finding of "negligence." Insisting that whenever there is a finding of an absence of "defect" for strict liability purposes all further inquiry is ended, Ford contends that there remains no other basis for plaintiffs' recovery.

Ford thus urges us to examine in detail the abstract legal relationship between the terms "defect" and "negligence." Such an examination is not necessary to our decision, however. We need only determine whether, in the posture in which this case went to the jury, the negative answer to interrogatory No. 3 precluded a finding of Ford's negligence liability. For reasons which we will develop, we conclude that it did not.

In determining the existence and effect of inconsistencies between general and special verdicts under section 625, we are governed by well settled principles. ■ "A special finding is inconsistent with the general verdict only when, as a matter of law, the special finding when taken by itself would authorize a judgment different from that which the general verdict will permit." (*Law* v. *Northern Assurance Co.* (1913) 165 Cal. 394, 407 [132 P. 590].) Since the special verdict or finding provided for in section 625 is ". . . primarily and principally for the purpose of determining whether the general verdict is or is not against law" (*Plyer* v. *Pacific etc. Cement Co.* (1907) 152 Cal. 125, 135 [92 P. 56]), no presumption is to be indulged in favor of answers to special interrogatories and every reasonable intendment in favor of the general verdict is indulged. (*Bate* v. *Marsteller* (1965) 232 Cal.App.2d 605, 615 [43 Cal.Rptr. 149]; 4 Witkin, Cal. Procedure (2d ed. 1971) Trials, § 280, p. 3086.)

The general and special verdicts must be beyond possibility of reconciliation under any possible application of the evidence and instructions. If any conclusions could be drawn thereunder which would

explain the apparent conflict, the jury will be deemed to have drawn them. (*Lowen* v. *Finnila* (1940) 15 Cal.2d 502, 504 [102 P.2d 520]; *Hudgins* v. *Standard Oil Co.* (1933) 136 Cal.App. 44, 50 [28 P.2d 433].)

■ Moreover, a special verdict can control the general only by its inherent force and clarity. Hence, it has been held that if inconsistent *special* findings are rendered, one of which supports, and the other of which tends to negate, the general verdict, the latter will stand. (*Koskela* v. *Albion Lumber Co.* (1914) 25 Cal.App. 12, 27 [142 P. 851].)

■ Applying these principles, and after careful consideration of Ford's argument, we cannot say under the circumstances of this case, that all possible theories of Ford's negligence were precluded by the negative answer to interrogatory No. 3. Accordingly, we conclude that the provisions of Code of Civil Procedure section 625 do not apply.

From the outset, the jury was presented with at least three alternative arguments upon which Ford's liability might rest. Plaintiffs first asserted, in effect, that there was a deficiency in the initial manufacturing process—the installation of improper braking fluid. Second, and some-what inconsistently, it was urged that though the fluid was fit for its intended use when installed, it deteriorated with use and that Ford failed to warn its dealers and customers of that fact. Finally, plaintiffs presented evidence to demonstrate that faulty engineering and design of the Continental's brakes, including Ford's failure to provide a back-up braking system, was a proximate cause of the accident.

All of these factual contentions were, in turn, submitted to the jury under the alternate legal theories of negligence and strict products liability. The jury was instructed independently on each theory. While the two separate sets of instructions paralleled each other in many respects they included no express or implied restriction on the jury's power to choose *either* theory as a self-sufficient basis of Ford's liability. Certainly there was no suggestion that failure to find *one* element of *one* theory would preclude assessment of liability on the other.

Indeed, the record reflects the common understanding of the court, counsel, and jury that, under the complaint and the evidence, the negligence and strict liability counts were independent of each other, and that a failure to find a "defect," as described in interrogatory No. 3, would not necessarily preclude all liability on Ford's part.

For example, Ford requested the giving of an instruction (BAJI No. 9.00 (1972)), which emphasized that a manufacturer and seller of a product were liable for a reasonably foreseeable injury caused by a "defect . . . *which existed at the time the product left their possession,* . . ." (Italics added.) Plaintiffs in response urged the addition of a phrase making clear that a "defect" could exist from the time of manufacture and sale "although manifested later." In arguing *against* this proposed modification (which was ultimately made), Ford's counsel expressed his understanding that a "defect" must be present at the time of manufacture and stated that, "[I]f a problem arises after the car is in service, we don't have strict liability; we have negligence." Also, the same counsel warned against an instruction which would "blur" the distinctions between the two theories, indicating that he intended to stress these distinctions before the jury. In fact, he did so. In his final argument, Ford's counsel suggested that the long period of trouble-free operation prior to the accident weighed against a finding that the car "was defective from the date it was manufactured."

The instructions given to the jury reinforced the concept that a "defect" must exist *at the time of manufacture.* The jury was told that a "defect" was a condition arising from "workmanship, material or design used in . . . manufacture." It was advised that the "defect" must have existed "when the product left [Ford's] . . . possession . . . ." While it is true that an instruction was given indicating that a failure to warn about necessary maintenance to avoid brake failure "may" render the automobile "defective," this wording expressly did not *require* the jury to view a continuing failure to warn of possible future problems as a manufacturing or design "defect." The jury also received broad instructions on negligence, suggesting that it *must* find Ford negligent if it concluded that the accident was a result of Ford's breach of its duty of due care *in any particular.* The jurors were specifically advised that Ford's failure to warn of an "unreasonably dangerous condition . . . *is* negligence." (Italics added.)

Finally, the jury was told that if it based its verdict on the theory of strict liability as opposed to negligence, it *must* also hold Johnson liable, though plaintiffs' counsel had indicated in his final argument that he *no longer sought* a judgment against Johnson.

All parties opposed the submission of special interrogatories to the jury. As we have noted, interrogatory No. 3, as proposed by the court, asked only if there was a "defect . . . *existing at the time* [the accident

vehicle] . . . *was manufactured and sold.*" (Italics added.) As in the case of the instructions described above, plaintiffs sought the insertion of a qualifying phrase "although manifested later." This time Ford's opposition to the modifying language was successful, producing an interrogatory confusingly at odds with, and even more narrowly phrased than, the instructions on "defect." Ford made no other relevant objection to the form of the special interrogatories prior to their submission, nor did it even suggest that interrogatories Nos. 1 (negligence) and 3 (defect) might be so answered as to produce an inconsistent verdict. Upon receiving the verdict, the court expressed the view that it was "thoroughly consistent;" Ford's counsel did not protest. The jury was polled and then discharged. Ford thereafter made the inconsistent-verdict argument for the first time on the joint motions for judgment notwithstanding the verdict and new trial.

Faced with the two separate theories, advanced in argument, and supported by instructions, the jury may have concluded that the braking system and the fluid were, at the outset, sound and fit for their intended purpose, but that Ford was nonetheless liable for its failure during the ensuing four years to warn of conditions which might develop in use. As we observe below, such conclusions would find support in the evidence. Additionally, they would have *permitted* the jury to find a "defect" under the broadest definition of that term included in the instructions. On the other hand, such a view of the evidence is also consistent with the jury's actual expression of its findings.

The jury could reasonably have concluded that the instructions, while *permitting* a finding of "defect" based on failure to warn, did not *require* it. Moreover, interrogatory No. 3 asked *only* about "defect[s] . . . *existing at the time* [*the car*] . . . *was manufactured and sold . . . .*" (Italics added.) The jury could reasonably believe that the interrogatory thereby intended to *exclude* consideration of any "defect" based on a failure to warn. Thus, even accepting *arguendo* Ford's view of the logical relationship between "defect" and "negligence," the jury's answer to interrogatory No. 3 would not preclude a finding that the elements of negligence were present.

■ We have consistently observed that a litigant is entitled to *instructions* on every theory advanced by him which finds support in the evidence. (*Phillips* v. *G. L. Truman Excavation Co.* (1961) 55 Cal.2d 801, 806 [13 Cal.Rptr. 401, 362 P.2d 33]; *Daniels* v. *City & County of San Francisco* (1953) 40 Cal.2d 614, 623 [255 P.2d 785].) Accordingly, and in

the face of arguments similar to those Ford makes here, we have found prejudicial error in a refusal to give negligence instructions in a products liability case, though the jury had been fully instructed on strict liability. (*Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 384 [93 Cal.Rptr. 769, 482 P.2d 681].) It follows necessarily that a party has the right to independent jury *consideration* of each theory presented by the instructions and supported by the evidence.

A finding of inconsistent verdicts in this case would ignore the jury's express finding of negligence, and would render superfluous a legal theory submitted to the jury without objection of either party. Such a result would not comport with the rationales of the *Jiminez* and *Koskela* decisions cited *supra.*

■ Accordingly, we hold that the jury's negative answer to interrogatory No. 3 was not fatally inconsistent with the general verdict for plaintiffs, within the meaning of Code of Civil Procedure section 625.

### 2. *Sufficiency of Evidence Against Ford*

We may more quickly dispose of Ford's claims that the evidence was insufficient to support a finding that brake failure caused the accident. ■ We do not reweigh the evidence on appeal, but rather determine whether, after resolving all conflicts favorably to the prevailing party (e.g., *Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 63-64 [107 Cal.Rptr. 45, 507 P.2d 653]; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]), and according prevailing parties the benefit of all reasonable inferences (e.g., *Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757]), there is substantial evidence to support the judgment. (E.g., *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) ■ Applying these principles, we find the evidence against Ford meets the requisite standard.

Ford's claims of insufficiency center upon its contention that plaintiffs' experts lacked a sufficient foundation from which to conclude that brake fluid vaporization had produced a brake loss. To the contrary, there was a perfectly adequate basis upon which plaintiffs' experts could and expressly did, form their opinions. The links in the reconstructive chain were: it was undisputed that the Hasson vehicle's brake fluid would vaporize at a temperature as low as 275°-280° F.; if it did vaporize, the result (in a single-master cylinder system) would be the virtually

complete loss of braking action which plaintiffs described as having occurred; and it was possible for such temperatures to be generated in the vehicle's use.

The record included evidence that air temperatures were warm on the day of the accident, which would tend to diminish the cooling effect of ventilation of the brakes. The driving pattern was stop-and-go over hilly terrain, meaning frequent application of the brakes, plus the additional buildup, or "soak up," of heat which occurs when already warm brakes are allowed to stand momentarily without ventilation. Plaintiffs' experts pointed to characteristics of disc brakes in general, as well as specific features of the 1966 Lincoln's brake system design in particular, which they believed would contribute to the buildup of heat under such conditions. Moreover, the symptoms described by the passengers and other witnesses—the apparent sudden, complete loss of pedal pressure (supported by the absence of skid marks) and return of pedal within 45 minutes after the accident (confirmed by investigating officers)—were entirely consistent with plaintiffs' theory of the accident. And, though the testimony was in conflict, there was some indication by expert witnesses that after the accident they perceived evidence of heat damage on components of the Hasson vehicle's braking system.

Ford elected not to dispute much of this evidence, suggesting rather, that the entirety of the evidence, including the results of its own tests, was more consistent with the probability of driver error as the sole cause of the accident.

The jury, of course, was not compelled to accept Ford's view simply because more than one inference could reasonably be drawn from the record. So long as the foundation for the opinions of plaintiffs' experts was sufficient, as we think it was, the jury was entitled to consider those opinions in forming its own conclusions. It was the function of the trier of fact to weigh all the evidence and to draw any reasonable inferences it found warranted.

We think the inferences here drawn were reasonable. That the evidence might also have supported Ford's version of the accident is irrelevant on appeal. We therefore hold that there was sufficient evidence to support a determination that fluid vaporization was a proximate cause of the accident.

### 3. *The Judgment Notwithstanding the Verdict for Beverly*

█ Though the question is closer, we conclude that the jury verdict adverse to Beverly was supported by the record. It follows that plaintiffs' contention on cross-appeal that the trial court erred in granting a judgment notwithstanding the verdict for Beverly on grounds of insufficient evidence is correct.

█ In passing upon the propriety of a judgment notwithstanding the verdict, appellate courts view the evidence in the light most favorable to the party who obtained the verdict and against the party to whom the judgment notwithstanding the verdict was awarded. (E.g., *Bufano* v. *City & County of San Francisco* (1965) 233 Cal.App.2d 61, 63 [43 Cal.Rptr. 223]; *Sparks* v. *Allen Northridge Market* (1959) 176 Cal.App.2d 694, 699 [1 Cal.Rptr. 595]; see *Rodabaugh* v. *Tekus* (1952) 39 Cal.2d 290, 291 [246 P.2d 663].) In other words, we apply the substantial evidence test to the jury verdict, ignoring the judgment.

█ There was evidence that Beverly had extensively serviced the car, including the braking system, approximately eight months and four thousand miles before the accident. The jury was properly instructed that: "An automobile dealer who undertakes to inspect and service an automobile has a duty to exercise reasonable care in such inspection and servicing of said automobile." (BAJI No. 9.21, as modified by the trial court.) The trial court nonetheless vacated the jury's determination that Beverly was negligent because it found no evidence (1) that Beverly and its employees had prior knowledge of a brake fluid problem in 1966 Lincoln Continentals or that Ford had passed along to its dealers any information in that regard, or (2) of any industry custom or practice of periodically replacing brake fluid. As plaintiffs correctly note, the first of these conclusions of the trial court is refuted by the record. The second is not dispositive on the issue of Beverly's breach of its duty of due care.

The record reflects that employees of Beverly's service department *were* aware of the hygroscopic nature of the recommended brake fluid and the effect of this property on the safety of the braking system. Witness Kremer, who was employed as a Ford factory service-school instructor during the 1966 model year, testified that he routinely advised dealer representatives in his training courses that the boiling point of this fluid could become reduced through contamination. He therefore cautioned against careless storage of the fluid prior to use, though he never specifically recommended periodic changes of installed fluid.

Kremer was positive that he had conducted training sessions at Beverly, and that service employees from that dealership had attended programs conducted by him at the factory training center.

Witness Alexander, a Beverly "service writer" for 12 years, testified that he was aware that the boiling point of the factory-recommended brake fluid was reduced in service. Witness Snyder, another veteran Beverly service writer, testified that one or more 1966 Lincolns had been brought into Beverly with problems which he recognized as related to brake fluid boil and vaporization.

Moreover, the jury heard evidence that it was Beverly's custom and practice (as reflected in its service manual) to check the brakes at the 40,000-mile service and to perform a complete brake job, *including replacement of the brake fluid,* whenever inspection revealed that the brake linings were worn to within ⅛th inch of the rivets which held the linings to the brake drums. Plaintiffs' experts concluded from their examination of the Hasson linings after the accident that the linings would have been worn to that point at the time Beverly serviced the car just prior to its transfer to the Hassons.

Further, it was Beverly's usual custom to check the rear brakes whenever, on inspection, the front wheels were found to be packed, as they were in this case. Two employees of Beverly testified that the rear brakes should have been inspected and if worn linings were found the linings should have been replaced. On the other hand, there was evidence that periodic replacement of brake fluid was not an industry custom.

Beverly's own customary practices, of course, do not conclusively establish a standard of care to which it must be held in this case. (See, e.g., *Valentine* v. *Hayes* (1924) 67 Cal.App. 650, 653 [228 P. 57].) However, those procedures, emanating from an experienced and success-ful dealership, do provide some evidence of what a prudent expert in automobile repair would consider "reasonable standards" of inspection and maintenance. This consideration, combined with evidence that Beverly had *actual knowledge* of the specific danger which actually materialized in this case, legally entitled the jury to infer that Beverly had acted negligently in failing to inspect the brake fluid at the 40,000-mile service, and to replace it if necessary. The granting of the judgment notwithstanding the verdict was therefore improper.

### 4. *Contributory Negligence*

■ Defendants assert alternatively, however, that the trial court erred prejudicially in refusing, despite withdrawal of plaintiffs' objections, to instruct the jury on contributory negligence. We agree and accordingly reverse the judgment as to James.

■ We review certain applicable principles. Where contributory negligence is asserted as a defense, and where there is "some evidence of a substantial character" to support a finding that such negligence occurred, it is prejudicial error to refuse an instruction on this issue, since defendant is thereby denied a basic theory of his defense. (*Phillips* v. *G. L. Truman Excavation Co.* supra, 55 Cal.2d 801, 806-807; *Young* v. *Aro Corp.* (1973) 36 Cal.App.3d 240, 244 [111 Cal.Rptr. 535]; but see *Grey* v. *Fibreboard Paper Products Co.* (1966) 65 Cal.2d 240, 246 [53 Cal.Rptr. 545, 418 P.2d 153] [failure to instruct on assumption of risk nonprejudicial where jury adequately instructed on contributory negligence].) As in other applications of the "substantial evidence" principle, the requisite standard cannot be met by mere speculation or conjecture. (*Bardin* v. *Case* (1950) 99 Cal.App.2d 137, 142-143 [221 P.2d 292].) However, all reasonable inferences in support of the defense will be drawn. (*Linzsey* v. *Delgado* (1966) 246 Cal.App.2d 504, 507-508 [54 Cal.Rptr. 762].)

Further, the fact that evidence is "circumstantial" does not mean that it cannot be "substantial." Relevant circumstantial evidence is admissible in California. (Evid. Code, § 351.) Moreover, the jury is entitled to accept persuasive circumstantial evidence even where contradicted by direct testimony. (*Bruce* v. *Ullery* (1962) 58 Cal.2d 702, 711 [25 Cal.Rptr. 841, 375 P.2d 833]; *Gray* v. *Southern Pacific Co.* (1944) 23 Cal.2d 632, 640-641 [145 P.2d 561]; *Nevarov* v. *Caldwell* (1958) 161 Cal.App.2d 762, 777 [327 P.2d 111].)

The direct testimony of all the occupants of the car suggests that James drove safely, did all he could to prevent the accident, and was not negligent. Evidence which supported defendants' theory of driver error (from which arises their contributory negligence defense) was therefore entirely inferential. That evidence consisted primarily of experimental tests the results of which, defendants contend, indicated that the brakes of the Hasson vehicle could not have failed as suggested unless subjected to "severe abuse." ■ Experimental evidence is, of course, admissible where it (1) is relevant, (2) was obtained under conditions substantially similar to those to which it is sought to be applied, and (3) will not

cause undue delay in the trial or confusion for the jury. (*Culpepper* v. *Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 521 [109 Cal.Rptr. 110].)

We turn to a detailed review of the relevant record.

Ford retained a test driver, Robert Dale, to perform braking tests on a 1966 Lincoln Continental under various conditions, including those of the Hasson accident. Fluid temperatures at the front brakes (which become warmer than rear brakes under repeated use) were measured during these tests to determine when or whether fluid temperatures of 275° F.-300° F. might be obtained. Accordingly, attempts were made to duplicate the model of the Hasson vehicle, and, for one of the tests, to simulate, insofar as possible, the degree of system wear, load, outside temperature, speed, route, and driving and traffic patterns experienced by the Hasson car both before and during the accident.

In the first test, the car was stopped at various points on the route from the Hasson home to the accident, and was stopped again at the accident scene to permit the brakes to "soak up" to their maximum temperatures. The highest fluid temperatures achieved in this phase of the test were 200° F. (left) and 199° F. (right). Several runs were then made from the top of Mt. Olympus Drive to the crash site at the bottom of the hill. In each of these runs, the car was placed in either high or low gear, and the brakes were then applied as necessary during the descent to avoid exceeding a designated maximum speed (30 miles per hour in some runs, 15 miles per hour in others). The brakes were again permitted to "soak up" to their maximum temperatures after each run. The highest fluid temperatures achieved in this phase of the tests were 228° F. (left) and 229° F. (right). At no time during this "accident-reconstruction" test did the test fluid rise to the *lowest* temperature (248° F.) mentioned in the record as creating the possibility of vaporization of the Hasson fluid.

In a second test, the fluid in the brakes of the test vehicle was *preheated* to 220° F. (left) and 223° F. (right). The car was then driven in traffic on flat city streets at 35-40 miles per hour wherever traffic permitted. This was an approximation of the maximum speed of the Hasson car according to plaintiffs' direct testimony. During this run, the test driver applied *constant* brake pedal pressure, or "drag," equivalent to the pressure employed in a normal stop. Fluid temperatures in excess of 300° F. were achieved after 9 minutes and 5.6 miles.

Similar "drag" tests were conducted by *plaintiffs'* witness, Mr. O'Shea, in another 1966 Continental. In one of these tests, the test vehicle's brake fluid was preheated to 150° F., and the car was driven in city traffic at speeds up to 40 miles per hour with almost continuous "light" brake pressure, and with normal stops. A fluid temperature of 300° F. was obtained only after 20 miles. In another test conducted by Mr. O'Shea, the fluid was preheated to 200° F. and the car was again driven in traffic at speeds up to 40 miles per hour, with "light" brake application 85 percent of the time. In this test, 320° F. fluid temperature was achieved in a little over 19 minutes of driving.

■■ .Though it was obviously impossible to duplicate every facet of the Hasson accident, we think these tests in the aggregate were sufficiently designed and their administration sufficiently controlled to contribute materially to a search for the accident's cause. We therefore conclude that this experimental evidence was admissible under *Culpepper, supra.*

Moreover, though the test results are concededly subject to more than one reasonable interpretation, they do *permit* the inference that only excessively hard use of the brakes would give rise to the temperatures required to vaporize the Hasson vehicle's brake fluid. Despite plaintiffs' contrary testimony, the jury was entitled (though by no means obligated) to conclude that, had the car been driven with ordinary care over the accident route under the conditions described, the brakes would not have overheated to the point of failure. Thus, these test results constitute substantial, albeit circumstantial, evidence of James' negligence.

James argues additionally that, since the jury found defendants negligent, it must have rejected in toto their theories of brake abuse and driver error as causes of the accident. Hence, he urges, failure to instruct on the contributory negligence issue, even if error, was harmless, since, under the instructions, the jury weighed and rejected evidence of James' culpability. Neither law nor logic support this "all or nothing" view. The record permits an inference that *both James and defendants* were negligent contributors to this mishap. In the absence of contributory negligence instructions, it cannot be said with certainty that the jury rejected this possibility.

Under similar circumstances we have held that "strict liability should not be imposed upon a manufacturer when injury results from a use of its product that is not reasonably foreseeable." (*Cronin* v. *J.B.E. Olson*

*Corp.* (1972) 8 Cal.3d 121, 126 [104 Cal.Rptr. 433, 501 P.2d 1153].) Although in *Cronin* we observed that a vehicular collision did not constitute a normal use of a motor vehicle, nonetheless we concluded that "vehicle manufacturers must take accidents into consideration as reasonably foreseeable occurrences involving their products." (*Id.*) Similarly, in the matter before us, we think it reasonable to conclude that Ford must, in fulfilling its duty of due care, reasonably foresee the kind and degree of brake abuse which it asserts occurred in the instant case, even if such abuse itself constituted negligence. (Rest.2d Torts, § 302A.)

The jury here was instructed that defendants could be adjudged negligent if they failed to take reasonable precautions against a foreseeable harm. The evidence permitted the conclusion that Ford failed to take such foreseeable abuse into account in designing its braking systems and advising on their maintenance, and that Beverly similarly omitted such considerations in its servicing efforts. Hence, the jury could and did properly conclude that defendants were negligent.

Nonetheless, that any abuse shown by the evidence in this case was foreseeable, and therefore a basis of *defendants'* breach of due care, does not preclude the possibility that it *also constituted negligence on James' part* (Rest.2d Torts, *supra,* § 302A, com. b), thus *barring his recovery* on a negligence theory in any trial prior to our decision in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226]. The jury, however, was never told the legal effect of a finding that *both* parties were negligent. Under these circumstances, neither the general verdict for plaintiffs nor the jury's special finding of *defendants'* negligence establishes with certainty that the jury considered James blameless. We are therefore compelled to find that the trial court's failure to proffer an instruction on contributory negligence was prejudicial error affecting the judgment in favor of James.

██ While the contributory negligence defense would not affect the other passengers in the Continental, we must determine its effect on Hasson's separate right of recovery for medical expenses resulting from James' injuries. The issue has not been briefed by the parties and we find no California cases directly on point. With one exception, however, the uniform rule in other jurisdictions appears to be that a child's negligence contributing to his injuries is a defense to the parent's action for loss or expense incurred as a consequence of those injuries. (See 21 A.L.R.3d 469, 471-475; but see *Handeland* v. *Brown* (Iowa 1974) 216 N.W.2d 574, 579.) The Restatement view is in accord. (Rest.2d Torts, §§ 494, 703.) We

note further that, in a somewhat analogous context, California does recognize a decedent's negligence as a defense to an action by his heirs for damages resulting from his wrongful death. (E.g., *Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 189 [288 P.2d 12, 289 P.2d 242]; *Carlisle* v. *Kanaywer* (1972) 24 Cal.App.3d 587, 591 [101 Cal.Rptr. 246].)

This "imputed negligence" doctrine has long been criticized by commentators (see, e.g., Prosser, Torts (4th ed. 1971) § 125, pp. 892-893; 1 Harper & James, Torts (1956) § 8.8, pp. 632-633; Gregory, *The Contributory Negligence of Plaintiff's Wife or Child in An Action for Loss of Services* (1935) 2 Chi.L.Rev. 173, 174), and we agree that the reasoning traditionally advanced for its retention is less than completely persuasive. Nonetheless, where the issue has been neither raised nor briefed, we are reluctant to contravene that overwhelming precedent which may conform to the expectations of all parties. Such harshness as exists in the traditional rule is, of course, mitigated by the doctrine enunciated in *Li* v. *Yellow Cab Co., supra*, 13 Cal.3d 804, which on retrial will be applicable to the case under the principles of limited retroactivity therein expressed. (P. 829.) Accordingly, we hold that Hasson's judgment against Ford must also be reversed.

Finally, Ford raises a number of other issues each of which we find to be without merit.

### 4. *Conclusion*

In view of the several parties and theories herein presented, we must, for the guidance of the court in any retrial, determine the extent, if any, to which the issues in this complex case are to be limited. In deciding whether to permit retrial only on certain issues, we must determine whether those trial court determinations which were affected with error may be fairly and conveniently severed from those which were not. (E.g., *Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 801 [197 P.2d 713]; *Gray* v. *Cotton* (1913) 166 Cal. 130, 139 [134 P. 1145].)

If James again chooses to pursue theories of negligence, any retrial of this case will, as we have indicated, be subject to the doctrine of comparative fault announced in *Li* v. *Yellow Cab Co., supra*. The task of the finder of fact will therefore be to *balance* the *degrees* of plaintiff's and defendants' negligence, if any, in order to arrive at the amount of any recovery to be assessed.

This necessary balancing process, in contrast with the all-or-nothing result mandated under superseded principles of contributory negligence, clearly suggests that the questions of plaintiff's and defendants' fault are inextricably intertwined. Thus, we cannot limit any retrial to the issue of plaintiff's negligence alone.

Considerations of fairness also convince us that James should not be precluded from again pursuing his strict liability theory. As we have observed, we cannot say, upon this record, that the jury clearly reached a conclusion that any basis of strict liability was lacking; moreover, this strict liability theory is closely linked with that of negligence on the basis of the evidence adduced. Further, the similarity of evidence on the alternative theories at the first trial persuades us that no significant judicial time would be saved by precluding assertion of a strict liability count on retrial.

As to plaintiffs McHenry, Regvall, Savage, and Schapansky, the judgment against Ford is affirmed. The judgment notwithstanding the verdict in favor of Beverly is reversed and as to plaintiffs McHenry, Regvall, Savage, and Schapansky, judgment is entered against Beverly in accordance with the jury verdict. As to plaintiffs James and Hasson, the judgments against Ford and in favor of Beverly are reversed. Each party shall bear its own costs on appeal.

Tobriner, Acting C. J., Clark, J., and Sullivan, J.,* concurred.

MOSK, J.—I concur in the judgment but do so with a caveat that I am not acquiescing in an erroneous implication that might arise from a superficial reading of the opinion, i.e., that contributory negligence is a defense to a charge of defective manufacture of a product.

The majority opinion indicates the "underlying theory of the complaint" (*ante,* p. 536) was that the accident resulted from a brake failure

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

due to improper design and faulty manufacture. That sounds suspiciously like products liability. If it were, then contributory negligence would be irrelevant and failure of the trial court to instruct thereon would not be error. Our court has made it abundantly clear that strict liability for defective products and negligence are two distinct tort species. (*Ault* v. *International Harvester Co.* (1974) 13 Cal.3d 113 [117 Cal.Rptr. 812, 528 P.2d 1148, 74 A.L.R.3d 986]; *Cronin* v. *J. B. E. Olson Corp.* (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153].)

However the jury, by special interrogatories, found Ford and Beverly *negligent* and such negligence to be the proximate cause of injury and damage to the plaintiffs. Also by special interrogatory the jurors found no defect in the vehicle at the time it was manufactured and sold.

Thus it is clear the jury considered and decided the case on a negligence theory. The defendants raised contributory negligence as a defense. Although their defense may have been somewhat tenuous under the facts of this case, they were entitled to an instruction on the subject for the guidance of the jurors. It is for that reason that I arrive at the same conclusion as the majority.