[No. A040601. First Dist., Div. One. July 24, 1989.]

WINSTON SQUARE HOMEOWNER'S ASSOCIATION, Plaintiff and Appellant, v.
CENTEX WEST, INC., et al., Defendants and Respondents.

COUNSEL

Berger & Hopkins and A. Alan Berger for Plaintiff and Appellant.

Gordon & Rees, Douglas B. Harvey, William J. Peters, Dion N. Cominos, Severson, Werson, Berke & Melchior, Howard W. Ashcraft, Jr., Bloom & Leonard and Martin W. Mertes for Defendants and Respondents.

OPINION

HOLMDAHL, J.—Homeowner's association sued the developer and subcontractors of a townhouse development for various alleged defects. The issues on appeal relate to drainage problems at the development and the application of the statute of limitations thereto. Plaintiff also raises two issues regarding the award of costs to one defendant.

The judgment for defendants is affirmed.

*Statement of Facts and Procedural History*

Plaintiff Winston Square Homeowner's Association (hereafter, Winston Square) is composed of the homeowners of a townhouse development in Foster City. On August 25, 1982, Winston Square filed a complaint in San Mateo County Superior Court in an attempt to recover damages suffered as a result of alleged construction defects. Winston Square filed an amended

complaint on August 8, 1983. The amended complaint listed five "causes of action"—declaratory relief, breach of express warranty, breach of implied warranty, strict liability, and negligence. Defendants were the developer and various subcontractors.

By the time trial began, the parties had narrowed the alleged defective construction to seven areas:

1. drainage,
2. plastering,
3. gutters and downspouts,
4. chimney crickets,
5. valley gutters,
6. trim boards, and
7. balcony railings.

The trial was bifurcated. The first phase dealt only with the affirmative defense of the statute of limitations. At the first phase, the trial court heard testimony from numerous homeowners on the chronology of the events and the nature of the defects.

The trial court filed its statement of decision on September 22, 1987. Drainage is the only area in dispute on appeal.[1] The drainage defect caused ponding of water at various locations throughout the development. Centex West, Inc. (hereafter, Centex), the developer, and two subcontractors, Wilsey & Ham and Ruscigno Concrete Construction Company, were the defendants alleged to be liable for drainage defects.

The trial court concluded the drainage defects were patent and a four-year limitation period applied. Since the date of completion of the project was December 3, 1975, the four-year period expired before Winston Square filed its original complaint. However, in response to complaints from homeowners, Centex had endeavored to correct problems at the development. Thus, the crucial issue to be decided was whether the four-year period was tolled by Centex's attempts to effect repairs. On that issue, the trial court found no substantial evidence that any defendant performed any drainage

---

[1] According to Winston Square, the parties have settled all issues of the lawsuit except for those relating to drainage.

repairs after 1976. For all the other defects, however, the court ruled the statute of limitations was tolled by the efforts of Centex to correct the problems. The court determined the statute of limitations barred recovery of damages for any drainage defects. It added that even if the drainage defects had been latent, recovery would still be barred because Winston Square was aware or should have been aware of drainage problems.

On appeal, Winston Square challenges these findings, and the award of certain costs to Wilsey & Ham.

### Tolling of Statute of Limitations

Winston Square questions the trial court's application of the statutes of limitations to separate areas of damage. Winston Square contends it has one cause of action, for damages caused by the faulty construction and design of the townhouse units, and the statute of limitations must be applied uniformly to that single cause of action. Winston Square admits it espoused five separate theories of recovery, but asserts it never claimed to have separate causes of action for each area of damage. Winston Square concludes the trial court's finding that repairs by Centex tolled the limitations period for all areas of damage except for drainage defects is nonsensical.

Winston Square correctly notes California follows the primary right theory for defining a cause of action. "Under the theory, the invasion of one primary right gives rise to a single cause of action. [Citations.] It is the right sought to be established, not the remedy or relief, which determines the nature and substance of the cause of action. [Citation.]" (*R & A Vending Services, Inc.* v. *City of Los Angeles* (1985) 172 Cal.App.3d 1188, 1194 [218 Cal.Rptr. 667].)

Winston Square believes Centex invaded one primary right—Centex failed to provide homes and grounds free of defects.[2] The various areas of damage are merely manifestations of this single breach of duty. Winston Square asserts the language "no action shall be brought," in the applicable statutes of limitation, Code of Civil Procedure sections 337.1 and 337.15, means the limitations period applies to causes of action, not to individual areas of damage.[3]

---

[2] Winston Square appears to be arguing only Centex was estopped by the repairs. Wilsey & Ham asserts there is no evidence it participated in, ratified or even knew of Centex's repair efforts. Wilsey & Ham contends it is not bound by Centex's acts. Ruscigno Concrete Construction Company has not filed its own brief (it has joined in the brief filed by Centex).

[3] Code of Civil Procedure section 337.1 provides, in relevant part: "(a) Except as otherwise provided in this section, no action shall be brought to recover damages from any person

Centex suggests *Mack* v. *Hugh W. Comstock Associates* (1964) 225 Cal.App.2d 583 [37 Cal.Rptr. 466] has resolved the issue of whether repair of one construction defect tolls the limitations period as to only that defect.[4] In *Mack,* the plaintiffs contracted for the construction of a new home. The radiant heating system installed in the new home was defective, and on numerous occasions leaks occurred causing damage to the house and furnishings. Each time a leak occurred, the plaintiffs notified the two defendants and the defendants would attempt to repair the system. After several years of trouble with the system, the plaintiffs had it replaced. They then sued the defendants under a breach of warranty theory for the cost of installing the new system, damage to the house and furnishings, and mental anguish. The appellate court concluded the three-year statute of limitations was tolled during the period the defendants endeavored to make repairs. Therefore, the causes of action (against each defendant) for breach of warranty were timely filed with respect to the costs of installing the new system.

performing or furnishing the design, specifications, surveying, planning, supervision or observation of construction of an improvement to real property more than four years after the substantial completion of such improvement for any of the following:

"(1) Any patent deficiency in the design, specifications, surveying, planning, supervision or observation of construction or construction of any improvement to, or survey of, real property;

"(2) Injury to property, real or personal, arising out of any such patent deficiency; or . . . ."

Section 337.15 provides, in relevant part: "(a) No action may be brought to recover damages from any person, or the surety of a person, who develops real property or performs or furnishes the design, specifications, surveying, planning, supervision, testing, or observation of construction or construction of an improvement to real property more than 10 years after the substantial completion of the development or improvement for any of the following:

"(1) Any latent deficiency in the design, specification, surveying, planning, supervision, or observation of construction or construction of an improvement to, or survey of, real property.

"(2) Injury to property, real or personal, arising out of any such latent deficiency.

". . . . . . . . . . . . . . . . . . . . . . . .

"(g) The 10-year period specified in subdivision (a) shall commence upon substantial completion of the improvement, but not later than the date of one of the following, whichever first occurs:

"(1) The date of final inspection by the applicable public agency.

"(2) The date of recordation of a valid notice of completion.

"(3) The date of use or occupation of the improvement.

"(4) One year after termination or cessation of work on the improvement."

The other limitations period applied by the trial court, found in section 338, subdivision (2), as effective at the time of the trial court proceedings, provided: "Within three years:

". . . . . . . . . . . . . . . . . . . . . . . .

"2. An action for trespass upon or injury to real property."

All further statutory references are to the Code of Civil Procedure.

[4] Centex also suggests Winston Square accepted the concept of separate statutes of limitation for each defect and, therefore, Winston Square cannot raise this argument on appeal. During Winston Square's opening statment at trial, its counsel argued the court should look at Centex's overall activities on the issue of tolling.

(*Id.* at pp. 589-590.) However, since the plaintiffs did not allege the defendants had undertaken any repairs to the house or furnishings, the statute of limitations was not tolled with respect to damages to real and personal property other than the heating system itself. (*id.* at p. 590.)[5]

Centex notes the instant case presents even stronger facts than *Mack*—here, the drainage problems were unrelated to the other areas of damage.

Centex also believes this case is analogous to cases where courts have allowed separate causes of action when the harm is progressively developing, or continuing. (See *Anderson* v. *Brouwer* (1979) 99 Cal.App.3d 176, 181 [160 Cal.Rptr. 65]; *Avner* v. *Longridge Estates* (1969) 272 Cal.App.2d 607, 616 [77 Cal.Rptr. 633].) In such cases, a new limitations period begins to run with each manifestation of the defect, unless reasonable inspection and further inquiry after discovery of the initial defect would have shown the extent of the deficiencies. (*Ibid.*)

Centex's arguments are persuasive. Under Winston Square's theory, only one statute could apply and all construction defects at a development would have to be uniformly classified as patent or latent. Sections 337.1 (patent defects) and 337.15 (latent defects) refer to "deficiency" in the singular. Winston Square's fears that an acceptance of the trial court's ruling will lead to absurd results and increased litigation are groundless, as demonstrated by this very case. The trial court does not appear to have had any trouble segregating the various areas of damage, deciding which were patent and which were latent, and determining those on which Centex had performed repairs.

The other damage areas in this case all related to structural defects, which caused water intrusion in the townhouse units. Though Winston Square's pleading was sufficient, applying the definition of "cause of action" strictly, one could probably set forth three causes of action—one for drainage defects, one for defects causing water intrusion in the townhouse units, and one for defective balcony railings.

Recovery for drainage problems is barred because Winston Square did not timely resolve the matter. The trial court's application of the statutes of limitations to separate areas of damage was proper.

---

[5] The opinion refers to "causes of action for these and other consequential damages," (*id.* at p. 590) implying the plaintiffs had separate causes of action for the different kinds of damages suffered.

*Patent Versus Latent Defects*

■ Winston Square contends the trial court's finding that drainage problems were a patent defect was erroneous. Winston Square argues the defect was latent and the proper statute of limitations was 10 years as provided by section 337.15, rather than 4 years as provided by section 337.1.

The trial court stated: "The court finds that whatever defects may have existed in the drainage system at the Winston Square project were patent in nature. Based on the testimony presented, the court finds that the majority, if not all, of the ponding problems were simply caused by rainwater with nowhere to go. . . . Prior to December, 1975, many homeowners had observed standing water at various places throughout the project. . . . Based on the testimony of a number of witnesses, the court finds that the magnitude of the drainage problem did not increase appreciably over the years—rather that the amount of ponding varied only with the amount of rain. Therefore the court finds that the defendants have established that the defective condition complained of could have been discovered by December, 1975, if plaintiff had made an inspection of the type a reasonably careful and prudent person would make under similar conditions."

According to section 337.1, subdivision (e), " 'patent deficiency' means a deficiency which is apparent by reasonable inspection."[6] A patent defect " 'is one which can be discovered by such an inspection as would be made in the exercise of ordinary care and prudence. [Citations.] This is contrasted with a latent defect, one which is hidden and which would not be discovered by a reasonably careful inspection. [Citations.]' " (*Preston* v. *Goldman* (1986) 42 Cal.3d 108, 123 [227 Cal.Rptr. 817, 720 P.2d 476] quoting *Wagner* v. *State of California* (1978) 86 Cal.App.3d 922, 927 [150 Cal.Rptr. 489].) The test used to determine whether a deficiency is patent is objective. (*Preston*, at p. 123; *Mattingly* v. *Anthony Industries, Inc.* (1980) 109 Cal.App.3d 506, 511 [167 Cal.Rptr. 292].) Whether a defect is apparent by reasonable inspection is a question of fact. (See *Renown, Inc.* v. *Hensel Phelps Construction Co.* (1984) 154 Cal.App.3d 413, 420-421 [201 Cal.Rptr. 242].) Findings made by a trier of fact will not be disturbed if supported by substantial evidence. (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 544 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158].)

Winston Square's assertion that there was insufficient evidence to support a finding it was aware of a major, project-wide drainage problem is belied by

---

[6] Section 337.15, subdivision (b), defines "latent deficiency" as "a deficiency which is not apparent by reasonable inspection."

the evidence introduced at trial. Many homeowners testified regarding ponding problems adjacent to their units. These homeowners were all aware of the problem shortly after the purchase of their units, in the years 1972 through 1975.

The property management company, representing Winston Square, notified Centex in 1975 and 1976 of numerous instances of standing water throughout the development. Centex was aware of the drainage problem and made attempts to correct it. In letters dated in the of fall of 1976, addressed to Winston Square in care of its property management company, a contractor submitted a bid to install drain lines. The contractor noted "major drainage problems." The contractor performed the work and Centex paid for it.

Several witnesses testified the cause of the problem was obvious—the contours of the land and the slant of the pavement did not allow proper drainage. Shirley Montabon purchased her unit in 1973. She noticed standing water on her walkway in 1973. She was a member of the Winston Square Board of Directors from 1975-1977. According to Montabon, the board was aware of standing water problems at locations in the project. Similarly, William Catlin, who purchased his unit in 1977 and was on the board from 1978 to 1982, testified the board had received complaints about ponding problems. In at least one instance, a homeowner threatened to sue the board over a ponding problem. Patrick Kelly remembered the ponding problems had been mentioned in a newsletter sent to residents.

Winston Square claims only the manifestations of the problem were obvious, not the actual defect. As the preceding recital of the evidence shows, this simply is not true. Winston Square's citation to *Baker* v. *Walker & Walker, Inc.* (1982) 133 Cal.App.3d 746 [184 Cal.Rptr. 245] is not on point. In *Baker,* a wrongful death action, the decedent worked in a building with a defective heating and cooling system. The building temperature fluctuated between 53 and 88 degrees. The decedent contracted pneumonia as a result of the faulty system. There was no dispute the system was defective. Over a period of 14 years, however, no one, including the manufacturers, the general contractor or the subcontractor, could pinpoint or correct the problem. The *Baker* court held the defect was latent. (*Id.* at p. 759.) The definition of patent deficiency was never intended to apply where no one, least of all decedent, was able to discover the defect. (*Id.* at p. 762.)

As defendants suggest, *Baker* has no bearing on this case. The testimony shows the actual defect was easily observable. There appears to have been no dispute at trial over the cause of the drainage problems.

■ Even if the drainage problems could be characterized as a latent deficiency, the evidence establishes the trial court's alternative ground for barring recovery was correct; Winston Square discovered or should have discovered the problem and did not file suit within three years.[7] Sections 337.15 and 338 provide a "two-step limitation" for latent deficiencies. (*Regents of University of California v. Hartford Acc. & Indem. Co.* (1978) 21 Cal.3d 624, 641 [147 Cal.Rptr. 486, 581 P.2d 197].) "[A]ctions founded upon a latent defect in the development of real property must be filed within three or four years of discovery, depending on whether the action rests on breach of warranty or negligence, but in any case within ten years of the date of substantial completion of the improvement." (*Ibid.*) As the trial court found, Winston Square had to be aware of the drainage problems by no later than August 1979, and if not, it was only as a result of "a lack of due diligence."

The trial court's findings of fact are supported by substantial evidence. Given those findings, the correct limitations period was applied.

### Costs Awarded to Wilsey & Ham

Winston Square disputes two items of costs awarded to Wilsey & Ham. Wilsey & Ham was involved only with the drainage area of the action. The trial court's finding that recovery for drainage problems was barred by the statute of limitations resulted in Wilsey & Ham's dismissal from the action.

### A. Special Master Fees

■ The trial court appointed a special master to control discovery and to conduct settlement conferences. According to Wilsey & Ham, the appointment was made pursuant to a motion by Winston Square, and was opposed by Wilsey & Ham. Wilsey & Ham was charged a portion of the special master's fees. The trial court allowed Wilsey & Ham to recover these fees from Winston Square.

Section 1033.5, subdivision (a), provides a lengthy list of items allowable as costs. Subdivision (b) of that section provides a list of five items spe-

---

[7]The trial court stated: "The 3-year limitation period described in CCP § 338(2) would bar plaintiff's suit for any defect of which plaintiff was, or should have been, aware prior to 8/25/79. The court finds that by 8/25/79 the Board had received scores of complaints of water ponding at numerous locations throughout the entire project. . . . Therefore, whatever harm plaintiff suffered was as appreciable by 1979 as it was in 1982 when this action was filed . . . ."

cifically not allowed as costs.[8] Special master fees appear on neither list. Subdivision (c), in relevant part, provides: "Any award of costs shall be subject to the following:

"........................

"(4) *Items not mentioned in this section* and items assessed upon application *may be allowed or denied in the court's discretion.*" (Italics added.)

Neither the parties nor this court has located a case allowing or not allowing special master fees as costs. Winston Square concedes section 1033.5, subdivision (c), grants the trial court discretion to award an item of cost not specifically disallowed. But, Winston Square contends, the Legislature did not mean entirely new "categories" of costs would be left to the discretion of the trial court. Winston Square provides no authority for this contention, nor does it provide any persuasive argument.

A special master having been appointed by the court, his or her fee is analogous to the award of "[f]ees of expert witnesses ordered by the court." (§ 1033.5, subd. (a)(8); see *Estrin* v. *Fromsky* (1942) 53 Cal.App.2d 253, 255 [127 P.2d 603].) The expense of court-appointed experts is first apportioned and charged to the parties, and then the prevailing party's share is allowed as an item of costs. (See *City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199, 297, fn. 104 [123 Cal.Rptr. 1, 537 P.2d 1250].)

The trial court acted well within the broad discretion granted to it by section 1033.5, subdivision (c)(4), when it allowed the special master fees as an item of costs.

B. *Expert Witness Fees*

 Winston Square received an offer of $500,000, made on behalf of all defendants and cross-defendants, to settle this action.[9] Winston Square rejected the offer. Following its dismissal from the action, Wilsey & Ham

---

[8] The items not allowed, unless authorized by another statute, are: "(1) Fees of experts not ordered by the court.
"(2) Investigation expenses in preparing the case for trial.
"(3) Postage, telephone, and photocopying charges, except for exhibits.
"(4) Costs in investigation of jurors or in preparation for voir dire.
"(5) Transcripts of court proceedings not ordered by the court."
[9] No details of this offer appear in the record. However, the amount and terms of the offer, as relevant to this issue, do not appear to be in dispute.

sought to recover expert witness fees paid by it, pursuant to section 998.[10] The trial court granted Wilsey & Ham's request.

Winston Square asserts the trial court erred because there was never a trial on damages, or a judgment for damages, against which the section 998 offer could have been measured.

Joint offers by more than one defendant fall within the provisions of section 998 when defendants are united in interest and are sued on a theory of joint and several liability. (*Brown* v. *Nolan* (1979) 98 Cal.App.3d 445, 451 [159 Cal.Rptr. 469]; see also *Stiles* v. *Estate of Ryan* (1985) 173 Cal.App.3d 1057, 1066 [219 Cal.Rptr. 647].) Here, all defendants were not united in interest.[11] Nevertheless, the application of section 998 appears appropriate in this case. Though the joint offer did not break down the offer as to particular areas of damage or defendants, Wilsey & Ham received a judgment in its favor. Wilsey & Ham was an absolute prevailing party—it was completely absolved of any liability. As Wilsey & Ham contends, the subsequent settlement between plaintiff and the other defendants on issues other than drainage was irrelevant as far as Wilsey & Ham was concerned.

The trial court did not err when it allowed Wilsey & Ham to recover its expert witness fees as costs.

The judgment is affirmed.

Newsom, Acting P. J., and Stein, J., concurred.

---

[10] Section 998, subdivision (c), provides: "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment, the plaintiff shall not recover his or her costs and shall pay the defendant's costs from the time of the offer. In addition, in any action or proceeding other than an eminent domain action, the court, in its discretion, may require the plaintiff to pay the defendant's costs from the date of filing of the complaint and a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, the preparation or trial of the case by the defendant."

[11] Wilsey & Ham claims defendants agreed to be jointly and severally liable for the $500,000 offer.